Michael B. PRICE, Plaintiff,

v.

TIME, INC., and Don Yaeger, Defendants.

No. CIV.A.03–S–1868–S.

United States District Court, N.D. Alabama, Southern Division.

Feb. 3, 2004.

---

Stephen D. Heninger, Heninger Burge Vargo & Davis, Birmingham, AL, for Michael B. Price, plaintiff.

Kenneth M. Perry, Bradley Arant Rose & White, Birmingham, AL, Gary C. Huckaby, Kimberly Bessiere Martin, Scott B. Smith, Bradley Arant Rose & White, Huntsville, AL, for Time, Inc., Don Yaeger, defendants.

## MEMORANDUM OPINION
## AND ORDER

SMITH, District Judge.

This action was commenced in the Circuit Court of Jefferson County, Alabama by Michael B. Price, who briefly was coach of the University of Alabama football team. He sued Time, Inc., and Don Yaeger for libel, slander, and outrageous conduct. These claims are based upon allegedly false and defamatory statements uttered by Yaeger during an interview broadcast on sports analyst Paul Finebaum's syndicated radio program, and au-thored by Yaeger for an article published by Time, Inc., in *Sports Illustrated* maga-zine.[1] Defendants timely removed the ac-tion to this court on July 22, 2003, on the basis of the court's diversity jurisdiction. *See* 28 U.S.C. §§ 1332(a)(1), 1441, 1446.

Plaintiff subsequently filed a motion to compel defendants to answer interrogato-ries asking for the identities of unnamed sources quoted by Yaeger in his radio interview and *Sports Illustrated* article. Defendants' opposition to the motion was principally based[2] upon the following Ala-bama statute:

> No person engaged in, connected with or employed on any newspaper, radio broadcasting station or television sta-tion, while engaged in a news-gathering capacity, shall be compelled to disclose in any legal proceeding or trial, before any court or before a grand jury of any court, before the presiding officer of any tribunal or his agent or agents or before any committee of the Legislature or elsewhere the sources of any informa-tion procured or obtained by him and published in the newspaper, broadcast by any broadcasting station, or televised by any television station on which he is engaged, connected with or employed.

Ala.Code § 12–21–142 (1975) (1995 Re-placement Volume).[3]

---

1. *See* plaintiff's state court complaint, ap-pended to doc. no. 1 (Notice of Removal), at 1 & ¶ 1.

2. Alternatively, defendants contended that the information sought was exempted from dis-closure by the qualified "reporter's privilege" afforded by the First Amendment to the Unit-ed States Constitution, but this court rejected that argument.

3. In a diversity case, a federal district court is bound to apply state substantive law and fed-eral procedural rules. *See, e.g., Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc.*, 666 F.2d 492, 494–95 (11th Cir.1982).

Although evidentiary rules generally are con-sidered matters of procedure, Federal Rule of Evidence 501 specifically provides otherwise when addressing the issue of privileges:

> Except as otherwise required by the Con-stitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be inter-preted by the courts of the United States in the light of reason and experience. *Howev-er, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of deci-*

This court concluded that Alabama Code § 12–21–142 does not apply to *magazine* reporters, but only to reporters "employed on any newspaper, radio broadcasting station or television station, while engaged in a news-gathering capacity,"[4] and ordered defendants to provide full and complete answers to plaintiff's interrogatories seeking disclosure of the unnamed sources for Yaeger's allegedly false and defamatory statements.[5]

Defendants filed a motion to alter or amend the court's order or, in the alternative, for certification of the issues raised by plaintiff's motion to compel for immediate appeal to the United States Court of Appeals for the Eleventh Circuit,[6] as well as a motion to stay implementation of the order pending appellate review.[7] The motion to stay was granted, pending consideration of defendants' motion for interlocutory appeal. This court then directed its Law Clerk to contact all counsel by telephone, and solicit their views on whether it would not be more expeditious and appropriate to certify the question of the scope of Alabama Code § 12–21–142 to the Supreme Court of Alabama in the first instance, rather than to endorse an interlocutory appeal to the Eleventh Circuit which, due to the paucity of interpretive authority, probably would do the same thing.

Defendants subsequently filed a "Supplement to Defendants' Motion to Alter or Amend or, in the Alternative, for Certification for Interlocutory Appeal," specifically requesting that the court certify the statutory question to the Supreme Court of Alabama in accordance with Alabama Rule of Appellate Procedure 18.[8] Plaintiff opposed certification of the court's order for either an interlocutory appeal to the Eleventh Circuit Court of Appeals, or to the Supreme Court of Alabama.[9]

Certification by a federal court of a question of state law is permitted under section 6.02(b)(3) of the Alabama Constitution of 1901, as amended,[10] and Alabama Rule of Appellate Procedure 18, reading, in pertinent part, as follows:

(a) **When Certified.** When it shall appear to a court of the United States that there are involved in any proceeding before it questions or propositions of law of this State which are determinative of said cause and that there are no clear controlling precedents in the decisions of the Supreme Court of this State, such federal court may certify such questions or propositions of law of this State to the Supreme Court of Alabama for instructions concerning such questions or propositions of state law, which certified question the Supreme Court of this State, by written opinion, may answer.

．　　．　　．　　．　　．

(c) **Method of Invoking Rule.** The provisions of this rule may be invoked by any of the federal courts upon its own motion or upon the suggestion or

---

sion, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.
Fed.R.Evid. 501 (emphasis supplied).

4. *See* doc. no. 22 (memorandum opinion entered Dec. 8, 2003).

5. Doc. no. 21 (order entered Dec. 8, 2003).

6. Doc. no. 24.

7. Doc. no. 23.

8. Doc. no. 27.

9. *See* doc. no. 29.

10. Article VI of the Alabama Constitution of 1901 was amended in 1973, and now includes the following provision: "The supreme court shall have original jurisdiction ... to answer questions of state law certified by a court of the United States." Ala. Const. art. VI, amend. 328, § 6.02(b)(3).

motion of any interested party when approved by such federal court.

Ala. R.App. P. 18.

Moreover, the Eleventh Circuit has observed that, whenever there is "substantial doubt about a question of state law upon which a case turns," the issue "should be resolved by certifying the question to the state supreme court. Resolution in this way avoids the unnecessary practice of guessing the outcome under state law and offers the state court an opportunity to explicate state law." *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1268 (11th Cir.2003) (citations omitted); *see also, e.g., Sultenfuss v. Snow*, 35 F.3d 1494, 1504 (11th Cir.1994) (*en banc*) (Carnes, J., dissenting) ("Only through certification can federal courts get definitive answers to unsettled state law questions. Only a state supreme court can provide what we can be assured are 'correct' answers to state law questions, because a state's highest court is the one true and final arbiter of state law.").

For all of the foregoing reasons, this court concludes that certification of the question of the scope of Alabama Code § 12–21–142 to the Supreme Court of Alabama is advisable. There are no clear, controlling, precedents in the decisions of the Supreme Court of Alabama on this issue, and its significance extends beyond this case. *See, e.g.,* R. Robin McDonald, "Magazine Ordered to Reveal Its Sources," *Fulton County* [Georgia] *Daily Report,* Jan. 9, 2004, at 1; Jay Reeves, "Ruling in Price Lawsuit Raises Issues Over Confidential Sources," *Birmingham News,* Dec. 30, 2003, at 4B. Accordingly, the alternative aspect of defendants' supplemental motion will be granted.

## I. CERTIFICATION FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA PURSUANT TO ARTICLE VI, § 6.02(b)(3), OF THE ALABAMA CONSTITUTION OF 1901, AND RULE 18 OF THE ALABAMA RULES OF APPELLATE PROCEDURE

### TO THE SUPREME COURT OF THE STATE OF ALABAMA AND THE HONORABLE JUSTICES THEREOF:

The gravamen of plaintiff's claims against defendants is that the article published in the May 12, 2003 issue [11] of *Sports Illustrated* magazine contained false and defamatory statements. The story, entitled "Bad Behavior: How He [Coach Price] Met His Destiny At A Strip Club," contains an account of activities allegedly occurring on April 16 and 17, 2003, while Coach Price was in Pensacola, Florida, to participate in a golf tournament. According to defendants, the narrative was "pieced together" from "numerous interviews with people who spent time with or saw Price in Pensacola." [12] The following extract from the lengthy story touches upon the salient points.

On April 16, Price flew from Tuscaloosa to Pensacola aboard the jet of Alabama businessman James Lee III, en route to the Emerald Coast Classic, a stop on the PGA Champions tour that was to be played that weekend. Price was part of the field for the celebrity pro-am.

The 57–year–old coach had barely hit the ground in Pensacola that afternoon when he headed to Arety's Angels, one of the city's six strip clubs, settled at a table not far from the main stage and

---

11. The article containing the allegedly defamatory statements was included in the *Sports Illustrated* issue bearing the printed date of May 12, 2003, but the magazine actually was distributed to consumers on May 8, 2003.

12. Doc. no. 15 (Plaintiff's Brief in Support of Motion to Compel Discovery), Ex. 1, at 40.

started buying drinks for dancers, according to two witnesses interviewed last week by SI [*Sports Illustrated*]. "He introduced himself as Mike," said waitress Amanda York. "But I love Alabama football, and I knew who he was. So later I leaned down and called him 'Coach.' He just held his finger to his lips as if to say, 'Don't tell.'"

According to the two witnesses, Price spent most of his time that afternoon buying dances from and drinks for Lori (Destiny) Boudreaux, a 36–year–old married mother of two who has worked in strip clubs for 15 years. "He offered to buy me a drink and asked me to sit with him," Boudreaux told SI. "I offered him a table dance. He tipped me $60. Then he asked me to take him to the semiprivate dance area. He got a little bad there. We have rules, and touching is not allowed."

Boudreaux said Price told her that he was married and had kids but never mentioned what he did for a living. "He told me I was the most beautiful woman he'd ever seen," Boudreaux said. "He kept telling me he had a room at the [Crowne Plaza] Hotel, and he wanted me to meet him there late that night. He was definitely persistent. I told him my husband was coming to pick me up after work, which he did, by the way."

. . . . .

At about midnight Price headed back to the hotel. He eventually met up with *two women,* both of whom he had earlier propositioned for sex, *according to one of the women, who agreed to speak to SI about the hotel-room liaison on the condition that her name not be used.* The woman, who declined comment when asked if she was paid for the evening, said that the threesome engaged "in some pretty aggressive sex." She said

that at one point *she and her female companion* decided to add a little levity to the activity: "We started screaming 'Roll Tide!' and he was yelling back, 'It's rolling, baby, it's rolling.'" (Reached on his cellphone on Sunday, Price said that he visited Arety's only once on April 16—after the sponsors' dinner—and denied having sex with two women in his hotel room or even inviting anyone to the room.)

The next morning, *according to the woman interviewed by SI, she got up early and left the hotel before Price departed for his eight o'clock tee time.*[13]

The article also reported other incidents related to Coach Price's alleged behavior in Tuscaloosa, Alabama. For example,

[a]ccording to a source close to the athletic department, Price had already been chastised twice by athletic director Mal Moore for spending time buying drinks for students and "generally serving as the life of the party in too many bars."

In fact, two Alabama students spoke to SI on Monday about an incident that apparently led to one of Moore's conversations with Price. According to one of the students, a few weeks after Price was hired, the coach went to Buffalo's American Grille near campus and, after four hours of drinking, propositioned some female students. "I heard him tell several girls who he was buying drinks for that his wife was still in Washington and he wanted them to come to his room at the GameDay Condos," one of the student sources said. "One of the girls lives at GameDay, and when we went by there at 2:30 a.m., he was stumbling around and told us he had forgotten the entry code to get up in the elevator. One girl offered to help, and he tried to talk her into coming to his condo. Everyone was kind of shocked."[14]

---

13. *Id.* at 40, 42 (emphasis added).

14. *Id.* at 42, 44.

Although plaintiff seeks to compel defendants to disclose the identities of the unnamed sources for all of the events described above, his argument focuses on the identity of the woman who was the source of information about the activities that allegedly occurred in his Pensacola hotel room during the late evening and early morning hours of April 16–17, 2003.

## II. DISCUSSION

A "privilege" generally is defined as a "special legal right, exemption, or immunity granted to a person or class of persons; an exception to a duty." *Black's Law Dictionary* 1215 (7th ed.1999).[15]

At common law, a reporter did not possess a privilege to conceal the identity of confidential sources of information obtained in the course of newsgathering activities, and could be compelled to disclose such sources in a legal proceeding before a court, grand jury, or other governmental body. *See, e.g., Branzburg v. Hayes*, 408 U.S. 665, 685, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972) ("At common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury."); *id.* at 698, 92 S.Ct. at 2665 ("[T]he common law recognized no such privilege.").

The common law position is rooted in the fundamental rule that each person summoned as a witness in a legal proceeding is under a duty to answer the subpoena, and to testify truthfully about those relevant facts known to the witness. Exceptions to that duty have been recognized grudgingly, because evidentiary privileges do not aid in the ascertainment of truth. *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) (privileges "are not lightly created nor expansively construed, for they are in derogation of the search for the truth"); *see also, e.g., Trammel v. United States*, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980) (privileges "strictly construed").

In almost every instance, the exemptions carved out of the common law's insistence upon "every man's evidence" have been justified on the basis that "they protect interests or relationships which, rightly or wrongly, are regarded as of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." *Ex parte Rudder*, 507 So.2d 411, 414 (Ala.1987) (citation omitted). The United States Supreme Court spoke to this point in *United States v. Bryan*, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950), saying:

> Certain exemptions from attending or, having attended, giving testimony are recognized by all courts. But every such exemption is grounded in a substantial individual interest which has been found, through centuries of experience, to outweigh the public interest in the search for truth. Dean Wigmore stated the proposition thus: "For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule."

*Id.* at 331, 70 S.Ct. at 730 (quoting Wigmore, *Evidence* § 2192 (3d ed.)).

---

**15.** *See also* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 693 (2d ed.1995) (defining privilege as "a slippery legal word most commonly denoting a person's legal freedom to do or not to do a given act").

The common law rule was carried forward by the Rules of Evidence promulgated by the Supreme Court of Alabama in 1996, which provide that:

> Except as otherwise provided by constitution or statute or by these or other rules promulgated by the Supreme Court of Alabama, no person has a privilege to:
>
> (1) refuse to be a witness;
>
> (2) refuse to disclose any matter;
>
> (3) refuse to produce any object or writing; or
>
> (4) prevent another from being a witness or disclosing any matter or producing any object or writing.

Ala. R. Evid. 501.

The Alabama Legislature created a privilege protecting the sources of a *newspaper* reporter's information during the 1935 regular session. That statute read as follows:

> No person engaged in, connected with or employed on any *newspaper* while engaged in a news gathering capacity shall be compelled to disclose, in any legal proceeding or trial, before any court or before a grand jury of any court, or before the presiding officer of any tribunal or his agent or agents, or before any committee of the legislature, or elsewhere, the source of any information procured or obtained by him and published in the newspaper on which he is engaged, connected with or employed.

Act of Aug. 21, 1935, No. 253, § 2, 1935 Ala. Acts 649 (emphasis supplied), subsequently codified at Ala.Code Tit. 7, § 370 (1940). The preamble to this statute stat-ed that its purpose was "[t]o define the obligation of *newspaper employees* when called upon to testify before any court, tribunal, commission or inquest." *Id.* (emphasis supplied). The third section of the statute elaborated the legislature's intent in the following words: "The purpose of this act, is to safeguard and protect the professional confidence of [a] *newspaper* and *newspapermen.*" *Id.*

This statutory privilege was amended by the Alabama Legislature in 1949 to include persons employed as reporters for *electronic broadcasting* media:

> No person engaged in, connected with or employed on any newspaper, *radio broadcasting station or television station,* while engaged in a news-gathering capacity, shall be compelled to disclose in any legal proceeding or trial, before any court or before a grand jury of any court, before the presiding officer of any tribunal or his agent or agents or before any committee of the Legislature or elsewhere the sources of any information procured or obtained by him and published in the newspaper, broadcast by any broadcasting station, or televised by any television station on which he is engaged, connected with or employed.

Act of Aug. 9, 1949, No. 376, § 1, 1949 Ala. Acts 548 (emphasis supplied), now codified at Ala.Code § 12–21–142 (1975) (1995 Replacement Vol.). Television was in its infancy in 1949,[16] whereas magazines, such as the *Atlantic Monthly* and *Saturday Evening Post,* began national circulation during the Nineteenth Century, and *Time, Fortune,* and *Life* were well established by the 1930s.[17] As a consequence, the failure

---

**16.** *See Radio and Television,* at http://www.historychannel.com (last visited December 2, 2003) ("Although experimentation with television broadcasting began in the late 1920s, technical difficulties, corporate competition, and World War II postponed its introduction to the public until 1946.... The television boom occurred between 1949, when 940,000 households had a set, and 1953, when the number soared to 20 million.").

**17.** *Magazines and Newspapers,* at http://www.historychannel.com (last visited December 2, 2003).

of the Alabama Legislature to broaden the scope of the statutory privilege to include reporters for additional forms of *print media* may be a significant omission. Plaintiff contends that it is.[18]

Plaintiff's argument essentially is based upon the canon of construction known as *expressio unis est exclusio alterius,* which provides that the expression or inclusion of one thing in the language of a statute "implies the exclusion of the other, or of the alternative." *Black's Law Dictionary* 602 (7th ed.1999).[19] Stated differently, the canon means that those subjects not specifically designated by the language of a statute should not be implied by a court in the guise of "construction." *See, e.g., Fedorenko v. United States,* 449 U.S. 490, 512–13, 101 S.Ct. 737, 750–51, 66 L.Ed.2d 686 (1981) ("We are not at liberty to imply a condition which is opposed to the explicit terms of the statute."); *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 188, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978) (refusing to read additional exemptions into the Endangered Species Act).

This canon of construction has long been employed by Alabama courts. *See, e.g., Jefferson County v. Alabama Criminal Justice Information Center Commission,* 620 So.2d 651, 658 (Ala.1993) ("It is clear that if the legislature had intended to make local governments responsible for the financial needs of the ACJIC, it would have done so when it set out specific duties in the statute."); *City of Birmingham v. Brown,* 241 Ala. 203, 208, 2 So.2d 305, 309

(Ala.1941) ("As evidence of the legislature's intent ..., it is significant to note that the legislature has expressly granted the right of condemnation in aid of some of the uses enumerated in section 2046, impliedly withholding the right in others: *Expressio unius est exclusio alterius.*"); *Smith v. Alabama,* 660 So.2d 1320, 1324 (Ala.Civ.App.1995) (statute's specific enumeration of jurisdictional matters while omitting reference to filing fees "implies an intention to exclude other requirements not so included.").

The "fundamental rule of statutory construction," however, as the Supreme Court of Alabama often has said, "is to ascertain and give effect to the intent of the Legislature in enacting a statute.... If possible, a court should gather the legislative intent from the language of the statute itself." *Jefferson County v. Acker,* —— So.2d ——, ——, 2003 WL 22463396, at *4 (Ala.2003) (quoting *Norfolk Southern Ry. Co. v. Johnson,* 740 So.2d 392, 396 (Ala.1999)) (in turn citing *IMED Corp. v. Systems Engineering Assocs. Corp.,* 602 So.2d 344, 346 (Ala.1992), and *Advertiser Co. v. Hobbie,* 474 So.2d 93 (Ala.1985)). This is but another way of expressing the "plain meaning rule," which provides that,

> when the language of a statute is plain and does not lead, in the case before the court, to absurd or impracticable results, there is no occasion or excuse for judicial construction; the language must then be accepted by the courts as the sole evidence of the ultimate legislative

---

**18.** Plaintiff's argument is a syllogism. The major premise is that the Alabama Legislature could have included reporters for magazines or any other media source of news among those entitled to claim the statutory privilege if it had chosen to do so. *See* doc. no. 15 (plaintiff's brief in support of motion to compel), at 2. The minor premise is that the Legislature specifically limited the privilege to persons "engaged in, connected with[,] or employed on any newspaper, radio broadcasting

station or television station, while engaged in a news-gathering capacity." The conclusion drawn by Coach Price from these premises is that Alabama Code § 12–21–142 does not apply to defendants.

**19.** The seventh (1999) edition of *Black's Law Dictionary* provides the following illustration at page 602: "For example, the rule that 'each citizen is entitled to vote' implies that noncitizens are not entitled to vote."

intent, and the courts have no function but to apply and enforce the statute accordingly. Stated another way: when the language is plain and admits of no more than one meaning, the duty of interpretation does not arise and the rules which are to aid doubtful meaning need no discussion.

Edward F. Hennessey, *Judges Making Law* 28 (1994) (footnotes omitted).

The plain meaning rule is reinforced by yet another fundamental principle of Alabama law: "statutes in derogation or modification of the common law are strictly construed.... Such statutes are presumed not to alter the common law in any way not expressly declared." *Ex Parte Key,* —— So.2d ——, ——, 2003 WL 21480618, at *4 (Ala.2003) (refusing to hold that the common law "year-and-a-day rule" had been abolished by the enactment of the Criminal Code) (citations and internal quotation marks omitted). *See also Arnold v. State,* 353 So.2d 524, 526 (Ala.1977) (strictly construing statute which allowed, but did not require, a husband and wife to testify for or against each other in criminal cases, because statute was in derogation of the common law rule that spouses were incompetent to testify against each other); *Grant v. State Department of Human Resources,* 560 So.2d 1050, 1052 (Ala.Civ.App. 1989) (strictly construing statute which provided an exception to the general rule that hearsay is inadmissible in evidence); *Sutherland v. Roth,* 407 So.2d 139, 140 (Ala.Civ.App.1981) (strictly construing statute which altered the common rule that parents are not automatically liable for their child's torts).

Alabama Code § 12–21–142 is "in derogation of the common law," insofar as it modifies the common law's refusal to recognize the existence of any privilege authorizing a reporter to refuse to reveal confidential information relevant to the issues of a legal proceeding. For that reason, in addition to the plain and unambiguous terms of § 12–21–142, this court strictly construed the language of the statute in the opinion entered on December 8, 2003, holding that the legislatively-created privilege shields *only* those reporters who are "employed on any newspaper, radio broadcasting station or television station, while engaged in a news-gathering capacity."

Defendants contend, however, that strict construction of § 12–21–142 leads to absurd results. The following argument is illustrative of their position:

> Price would have this Court rule that the applicability of § 12–21–142 turns solely on whether the information from the source is ultimately printed on newspaper. Under Price's reasoning, a reporter for the *Cleburne News* could assert the privilege under § 12–21–142, but a reporter for *Newsweek* could not, even though both are published weekly, simply because *Newsweek* is printed on glossy paper. Apparently, Price would also deny internet-only news outlets (e.g., Slate.com) and wire services (e.g., Reuters) the ability to assert the privilege in Alabama because neither is expressly listed in the statute. No rational reason exists to conclude that the Alabama Legislature intended to discriminate among news-gathering outlets.[20]

Defendants also contend that the definition of the statutory term "newspaper" is broad enough to encompass a "magazine." They argue, for example, that

> the term "magazine" is reasonably included in the definition of "newspaper" as contemplated in § 12–21–142.

---

**20.** Doc. no. 14 (defendants' response to plaintiff's motion to compel), at 7 (footnotes omitted).

"Newspaper" is generally defined as "a paper that is printed and distributed daily, weekly, or at some other regular and usu[ally] short interval and that contains news, articles of opinion (as editorials), features, advertising, or other matter regarded as of current interest." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1524 (1993). The relevant definitions of "magazine" are "a periodical that usu[ally] contains a miscellaneous collection of articles, stories, poems, and pictures and is directed at a group having a particular hobby, interest, or profession (as education, photography, or medicine) or at a particular age group (as children, teenagers) ...." *Id.* at 1357–58. The similarity in definitions is no doubt the reason that "magazine" is a recognized synonym of "newspaper." *See, e.g.,* WEBSTER'S COLLEGIATE THESAURUS 505 (1988) (indicating that "magazine, organal, periodical, [and] review" are synonyms of newspaper); ROGET'S 21ST CENTURY THESAURUS IN DICTIONARY

FORM 573 (1992) (defining newspaper as a "regular, continuous publication containing information" and indicating that "biweekly, bulldog, community, daily, extra, gazette, journal, magazine, metropolitan, organ, paper, periodical, press, rag, record, review, scandal sheet, sheet, tabloid, trade, [and] weekly" are synonyms of newspaper). Thus, because "magazine" is reasonably included in the definition of "newspaper" as contemplated in § 12–21–142, a magazine and its reporters may assert the privilege provided news-gathering persons therein.[21]

This court was not persuaded by that argument. The contention that a "magazine" such as *Sports Illustrated,* which is "directed at a group having a particular ... interest,"[22] should be considered a synonym for "newspaper" strains the commonly understood meanings of those words.[23]

Defendants' semantical argument also is undercut by the fact that the Alabama Legislature often has acknowledged a dis-

21. *Id.* at 3–4. Defendants additionally contend that the heading to Ala.Code § 12–21–142, which they incorrectly refer to as its "title" (*i.e.,* "Exemption of newsgathering persons from disclosing sources"), "indicates that the Alabama Legislature recognized the importance of all newsgathering outlets and intended that the privilege be equally available to all." *Id.* at 4. This argument is without merit. It ignores the Code Commissioner's interpretive guidance:

(a) The classification and organization of the titles, chapters, articles, divisions, subdivisions and sections of this Code, *and the headings thereto,* are made for the purpose of convenient reference and orderly arrangement, *and no implication, inference or presumption of a legislative construction shall be drawn therefrom.*

(b) Unless otherwise provided in this Code, *the descriptive headings or catchlines immediately preceding or within the text of the individual sections of this Code,* except the section numbers included in the headings or catchlines immediately preceding the text of such sections, *do not constitute*

*part of the law, and shall in no manner limit or expand the construction of any such section.* All historical citations and notes set out in this Code are given for the purpose of convenient reference, and do not constitute part of the law.

Ala.Code § 1–1–14 (1975) (1999 Replacement Vol.) (emphasis supplied). Moreover, the preamble to the 1949 amendatory statute stated its purpose in the following manner: "To Amend Section 370, Title 7, of the Alabama Code of 1940, the Section commonly referred to as 'The Newspaper Privilege' Law." Act of Aug. 9, 1949, No. 376, § 1, 1949 Ala. Acts 548 (now codified at Ala.Code § 12–21–142 (1975) (1995 Replacement Vol.))

22. *Webster's Third New International Dictionary* 1357–58 (2002) (defining "magazine").

23. *See id.* at 1524 (including an entry for "newsmagazine," as distinguished from "newspaper," and defining the former noun as meaning "a periodical typically published weekly and devoted chiefly to summarizing and analyzing current news").

tinction between the terms "newspaper" and "magazine" by enacting statutory provisions in which both words appear. The following is a list of twenty such instances:

- Ala.Code § 8–6–2(18)(e) (1975) (2002 Replacement Vol.) ("'Investment adviser' does not include... [a] publisher, employee, or columnist of a *newspaper, news magazine,* or business or financial publication, or an owner, operator, producer, or employee of a cable, radio or television network, station, or production facility ....") (emphasis supplied);

- Ala.Code § 8–19A–4(6) (1975) (2002 Replacement Vol.) ("The provisions of this chapter do not apply to: ... [a] person primarily soliciting the sale of a *newspaper,* periodical of general circulation, or *magazine.*") (emphasis supplied);

- Ala.Code § 11–65–20(i)(v) (1975) (1994 Replacement Vol.) ("The advertising prohibited in the protected territory ... shall include ... any advertising carried by *newspaper, magazines* or other publications published at any location in the protected territory; ... with respect to *newspapers, magazines* and other publications, whether published at a location in or outside the protected territory ... with respect to *newspapers, magazines* and other publications that are not published at a location in the protected territory ....") (emphasis supplied);

- Ala.Code § 13A–8–150 (2) (1975) (1994 Replacement Vol.) (2002 Supp.) ("Definitions.... Publish. The communication or dissemination of information to any one or more persons, either orally in person, or by telephone, computer network, radio, television, or in a writing of any kind, including, without limitation, a letter or memorandum, circular, handbill, *newspaper, magazine* article, or book.") (emphasis supplied);

- Ala.Code § 13A–9–44 (1975) (1994 Replacement Vol.) ("A television or radio broadcasting station, or a publisher or printer of a *newspaper, magazine* or other form of printed advertising, which broadcasts, publishes or prints a false advertisement or a bait advertisement ... does not commit a crime ....") (emphasis supplied);

- Ala.Code § 13A–12–28(b) (1975) (1994 Replacement Vol.) ("In any prosecution under this article in which it is necessary to prove the occurrence of a sporting event, (1) a published report of its occurrence in any daily *newspaper, magazine* or other periodically printed publication of general circulation ... shall be admissible in evidence and shall constitute a prima facie proof of the occurrence of the event.") (emphasis supplied);

- Ala.Code § 13A–12–190(12) (1975) (1994 Replacement Vol.) ("Matter. Any book, *magazine, newspaper,* or other printed material ... that either are or contain a photographic or other visual reproduction of a live act, performance, or event.") (emphasis supplied);

- Ala.Code § 13A–12–200.1(15) (1975) (1994 Replacement Vol.) (2002 Supp.) ("Material. Any book, *magazine, newspaper,* printed or written matter, writing description, picture, drawing ....") (emphasis supplied);

- Ala.Code § 16–6B–10(a)(5) (1975) (2001 Replacement Vol.) ("Expenditures may include books, book binding, repair, CD Roms, computer software, computer equipment, cataloging, audio-visual materials, *newspapers, magazines,* recordings, and video tapes.") (emphasis supplied);

- Ala.Code § 16–13–231(a)(b)(2)(c) (1975) (2001 Replacement Vol.) ("Other expenditures may include ... *newspapers, magazines,* recordings, and video tapes.") (emphasis supplied);

- Ala.Code § 17–22A–2(a)(2)(b)(5) (1975) (1995 Replacement Vol.) (2002 Supp.) ("[T]his subparagraph shall not apply

... in *newspapers, magazines,* or other similar types of general public political advertising.") (emphasis supplied);

- Ala.Code § 17–22A–2(a)(4)b.1 and 7 (1975) (1995 Replacement Vol.) (2002 Supp.) ("1. Any news story, commentary or editorial prepared by and distributed through the facilities of any broadcasting station, *newspaper, magazine,* or other periodical publication .... 7 .... this subparagraph shall not apply ... in *newspapers, magazines,* or other similar types of general public political advertising.") (emphasis supplied);

- Ala.Code § 20–2–143(d) (1975) (1997 Replacement Vol.) ("Advertisement. It is unlawful for any person to place in any *newspaper, magazine,* handbill or other publication ... any advertisement or solicitation with reasonable knowledge that the purpose of the advertisement or solicitation is to promote the distribution or sale of an imitation controlled substance.") (emphasis supplied);

- Ala.Code § 23–1–7(d) (1975) (2000 Replacement Vol.) ("This section shall not be construed as repealing the provisions of Chapter 7 of Title 41 which prohibit the purchase of advertising in *newspapers, magazines,* programs or other periodicals published in the state with funds appropriated for tourist advertising.") (emphasis supplied);

- Ala.Code § 25–8–39 (1975) (2000 Replacement Vol.) ("No person under 14 years of age shall distribute, sell, expose, or offer for sale *newspapers, magazines,* periodicals, candy, or other articles ....") (emphasis supplied);

- Ala.Code § 27–2B–9(b) (1975) (1998 Replacement Vol.) ("... the making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly to be made, published, disseminated, circulated, or placed before the public, in a *newspaper, maga-*

*zine,* or other publication ... is therefore prohibited.") (emphasis supplied);

- Ala.Code § 28–3–16 (1975) (1998 Replacement Vol.) ("... There shall be no advertising of alcoholic beverages ... except through *newspapers, magazines,* radio broadcasting stations, commercial vehicles used for transportation of alcoholic beverages and billboards located in 'wet' counties ....") (emphasis supplied);

- Ala.Code § 28–7–23 (1975) (1998 Replacement Vol.) ("... Radio, television, *newspaper, magazine,* billboard and commercial vehicles used for transportation of table wine may be used to advertise table wine in accordance with rules and regulations issued by the board ....") (emphasis supplied);

- Ala.Code § 37–3–4(a)(6) (1975) (1992 Replacement Vol.) (2002 Supp.) ("This chapter shall not be construed to apply to: ... (6) Motor vehicles while used exclusively in the transportation of *newspapers* and *magazines* and United States mail.") (emphasis supplied);

- Ala.Code § 38–1–4(c) (1975) (1992 Replacement Vol.) ("Unlawful disclosure or use of names.—Except as provided in this section, it shall be unlawful for any person ... to solicit ... use of, any lists or names for ... publication in any *newspaper, magazine,* other periodical or otherwise, or for any purpose not directly connected with the administration of public assistance.") (emphasis supplied).

In like manner, the legislatures of some states that have enacted statutes shielding a reporter's sources of information from compelled disclosure have clearly indicated whether the privilege extends to *magazine* reporters, as opposed to reporters for other forms of print or electronic news media. For example, Montana's statute provides:

Without his or its consent, no person, including any newspaper, *magazine,*

press association, news agency, news service, radio station, television station, or community antenna television service or any person connected with or employed by any of these for the purpose of gathering, writing, editing, or disseminating news may be examined as to or may be required to disclose any information obtained or prepared or the source of that information in any legal proceeding if the information was gathered, received, or processed in the course of his employment or its business.

Mont.Code Ann. § 26–1–902(1) (WESTLAW through 2003 Sess.) (emphasis supplied).

Likewise, Pennsylvania's shield law, which is similar to the Alabama statute, reads as follows:

> No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, *or any magazine of general circulation,* for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

42 Pa. Const. Stat. Ann. § 5942 (West, WESTLAW current through Act 2002–25) (emphasis supplied).[24]

Other states have taken the course of extending the privilege to "any medium of communication to the public." New Mexico's reporter's privilege provision, for example, provides that: "Unless disclosure be essential to prevent injustice, no journalist or newscaster, or working associates of a journalist or newscaster, shall be required to disclose before any proceeding or authority . . . the source of any published or unpublished information for *any medium of communication* to the public." N.M. Stat. Ann. § 38–6–7(A) (WESTLAW through July 16, 2003) (emphasis supplied). Moreover, the phrase "medium of communication" is statutorily defined as "any newspaper, *magazine,* press association, news service, wire service, news or feature syndicate, broadcast or television station or network, or cable television system." *Id.* at § 38–6–7(B)(2) (emphasis supplied).

In like manner, Oklahoma's privilege statute exempts journalists from disclosing a source of information "obtained in the gathering, receiving or processing of information for *any medium of communication* to the public." Okla. Stat. Ann. § 2506(B) (West, WESTLAW through 2002 Sess.) (emphasis supplied).[25] Again, the Oklahoma legislature defined the phrase "medium of communication" as including "any newspaper, *magazine,* other periodical, book, pamphlet, news service, wire service,

---

**24.** Additionally, Nevada's statutory privilege extends to "reporter[s], former reporter[s] or editorial employee[s] of any newspaper, *periodical* or press association or employee of any radio or television station." Nev.Rev.Stat. 49.275 (West, WESTLAW through 2002 18th Special Sess.) (emphasis supplied). Rhode Island's statute likewise includes the term "periodical." R.I. Gen. Laws § 9–19.1–2 (WESTLAW through Jan. 2002 Sess.) ("[N]o person shall be required . . . to disclose the source of any confidential information received . . . in his or her capacity as a reporter, . . . journalist, writer, . . . or other person

directly engaged in the gathering or presentation of news for any accredited newspaper, *periodical,* press association, newspaper syndicate, wire service, or radio or television station.") (emphasis supplied).

**25.** Significantly, § 2506(B) also provides: "This subsection does not apply with respect to the content or source of *allegedly defamatory information, in a civil action for defamation wherein the defendant asserts a defense based on the content or source of such information.*" Okla. Stat. Ann. § 2506(B) (West, WESTLAW through 2002 Sess.) (emphasis supplied).

news or feature syndicate, broadcast station or network, cable television system, or record." *Id.* at § 2506(A)(2) (emphasis supplied).

This court is aware of no Alabama state court decisions construing the scope of Alabama Code § 12–21–142. Another judge of this court addressed the original statutory language, however, in the context of a collateral controversy that grew out of a civil action pending in the United States District Court for the Southern District of New York. *Ex parte Sparrow,* 14 F.R.D. 351 (N.D.Ala.1953). The action had been filed by former Alabama Governor James E. Folsom against Dell Publishing Company for allegedly libelous statements contained in an article published in defendant's magazine, *Front Page Detective,* under the title "Devil's Island, U.S.A." "The general theme of [the] article related to conditions existing in state prisons during plaintiff's tenure of office as Governor of the State of Alabama." *Id.* at 352. During preparation for trial it was learned that Hugh Sparrow—a veteran newspaper reporter who had written a series of articles on the same subjects for *The Birmingham News*—had furnished to the author of the magazine article at least some of the information upon which the allegedly libelous statements were based. Governor Folsom's attorneys consequently sought to depose Mr. Sparrow.

"During the course of plaintiff's examination of the witness, he refused to answer certain questions propounded to him by plaintiff's counsel, raising the claim of privilege against disclosure of his sources of information under an Alabama statute [*i.e.,* Alabama Code Title 7, § 370 (1940) ]." *Ex parte Sparrow,* 14 F.R.D. at 352 (footnote omitted).[26] The assertion of privilege was based upon the fact that, during "the process of collecting data which formed the factual basis for *his* [*Birmingham News* ] *articles,* [Sparrow had] received numerous reports given to him in confidence by employees of the State departments involved in his investigation." *Id.* (emphasis added).

Governor Folsom then instituted an ancillary proceeding in this court, to compel Sparrow to answer "the questions against which the claim of privilege had been interposed, as contemplated by the provisions of rule 37(a)." *Id.*[27] Judge Seybourn Lynne denied the motion, and sustained Sparrow's claim of privilege, saying:

It is conceded that the sources of information given to a journalist are not privileged under the law of New York and that if Sparrow were to appear as a witness there, he could and would be compelled to disclose his sources of information.

But rule 26, under which his examination was being conducted, provides that

**26.** In the omitted footnote, the *Sparrow* court quoted the language of the original statute, as enacted by the Alabama Legislature during 1935:

Newspaper employees.—No person engaged in, connected with or employed on any newspaper while engaged in a news gathering capacity shall be compelled to disclose, in any legal proceeding or trial, before any court or before a grand jury of any court, or before the presiding officer of any tribunal or his agent or agents, or before any committee of the legislature, or elsewhere, the source of any information

procured or obtained by him and published in the newspaper on which he is engaged, connected with or employed.
*Ex parte Sparrow,* 14 F.R.D. 351, 353 n. 1 (N.D.Ala.1953) (quoting Act of Aug. 21, 1935, No. 253, § 2, 1935 Ala. Acts 649, codified at Ala.Code Tit. 7, § 370 (1940)).

**27.** The pertinent language of the present rule provides that "[a]n application for an order to a person who is not a party shall be made to the court in the district where the discovery is being made, or is to be, taken [sic]." Fed. R.Civ.P. 37(a)(1).

" * * * the deponent may be examined regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action * * *." [28] For the purpose of determining the witness' claim of privilege, this court, by rule 37, is constituted the forum or the place where plaintiff, the proponent, is required to pursue his remedy to compel the witness to answer.

While this court does not consider the question of privilege to be a matter of substance and therefore controlled by *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, it would appear that this court should refer to the statutory law of Alabama in the absence of any Federal rule on privilege.

No Federal case has been called to my attention; I have found none, dealing with the claim of privilege by a journalist with respect to the sources of his information. The Alabama statute clearly privileges such sources of information. At least eleven other states have passed similar statutes.

This court is not bound to apply the Alabama law in interpreting the words "not privileged" as they appear in rule 26(b). But it would not be justified in ignoring such a clear and unequivocal pronouncement of the public policy of the state in which it sits, merely to reach out and apply a rule against the asserted privilege established in a non-federal jurisdiction.

It is not a matter of judicial concern that the Legislature of Alabama was either prudent or unwise in clothing the sources of a journalist's information with secrecy. So far as this court is concerned, the public policy of the State of Alabama in this regard was crystallized by enactment of the statute involved.

There is no merit in plaintiff's contention that such statute is unconstitutional when measured by the test of the Fourteenth Amendment to the Constitution of the United States.

It follows that Sparrow's claim of privilege is upheld and that the motion of proponent, the plaintiff, James E. Folsom, to compel such witness to answer the questions referred to is denied.

*Id.* at 353 (emphasis in original) (footnotes omitted).

Upon first reading the *Sparrow* opinion, it might appear that the decision, pertaining as it did to the confidential sources of allegedly libelous statements published in a national *magazine,* provides the rule for deciding the issue presently confronting the court. A closer reading establishes otherwise, however, because "Sparrow, during the course of his examination, refused to answer *only* those questions which would have required disclosure of the source of information procured or obtained by him *and published in the newspaper on which he was employed.*" *Id.* at 352 (emphasis supplied). Stated differently, the decision clearly implies that Sparrow did not contend that Alabama's statutory privilege applied to questions which required him to disclose any sources of information procured or obtained by him in confidence from state employees which were *not* published in the *Birmingham News,* but instead appeared for the first time in the *Front Page Detective* magazine article. *See* Joseph A. Colquitt, *Alabama Law of Evidence* § 5.6, at 173 (1990).

### III. CONCLUSION

If the question presented was one of public policy—*e.g., "Would it better serve the interests of a democratic society to*

---

**28.** The same principle now is found in Federal Rules of Civil Procedure 26(b)(1) and (b)(5).

*extend the Alabama statutory privilege to reporters for all mediums for communicating news to the public?"*—this court might be inclined to embrace defendants' arguments. That is *not* the issue, however. Rather, the duty of this court is to interpret and enforce the intention of the enacting legislature, and in that regard "[i]t is not a matter of judicial concern that the Legislature of Alabama was either prudent or unwise" in limiting the statutory privilege to only those persons "engaged in, connected with or employed on any newspaper, radio broadcasting station or television station." *Ex parte Sparrow,* 14 F.R.D. at 353. Instead, "[s]o far as this court is concerned, the public policy of the State of Alabama in this regard was crystallized by enactment of the statute involved," *id.,* and any deviation therefrom lies within the province of either the Alabama Legislature or Supreme Court of Alabama. Therefore, for the reasons explained in this memorandum opinion, it is ORDERED as follows:

(1) The alternative aspect of defendants' supplemental motion to alter or amend the order entered on December 8, 2003, or to certify a question of state law to the Supreme Court of Alabama, is GRANTED;

(2) All proceedings in this action, with the exception of plaintiff's motion for sanctions, are STAYED pending resolution of the certified question set forth below by the Supreme Court of Alabama.

The Clerk of this court is ORDERED and DIRECTED to immediately transmit to the Supreme Court of Alabama the certificate prepared by the court certifying a question of state law which is deemed determinative of the claim of privilege asserted by defendants in this action, and to which there is no clear controlling precedent in the decisions of the Supreme Court of Alabama. The Clerk is further ORDERED and DIRECTED to transmit the entire record, with the exception of docu-ments numbered 18, 28, and 30, pertaining to plaintiff's motion for sanctions, to the Supreme Court of Alabama.

Pursuant to Article VI, § 6.02(b)(3) of the Alabama Constitution of 1901, as amended, and Alabama Rule of Appellate Procedure 18, the following question is certified to the Supreme Court of Alabama:

> DOES THE EXEMPTION FROM DISCLOSING SOURCES OF INFORMATION FOUND IN ALABAMA CODE § 12–21–142 APPLY TO A PERSON "ENGAGED IN, CONNECTED WITH OR EMPLOYED ON ANY [*MAGAZINE* ], WHILE ENGAGED IN A NEWS–GATHERING CAPACITY"?

The phrasing of the question is not intended to limit the inquiry of the Supreme Court of Alabama. When answering the certified question, the Supreme Court is at liberty to consider the problems and issues involved in this case as it perceives them to be in its analysis of the record in this case.