[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 15, 2005
THOMAS  K. KAHN
CLERK

_____

No. 04-13027

_____

D. C. Docket No. 03-01868-CV-S-S

MICHAEL B. PRICE,

Plaintiff-Appellee,

versus

TIME, INC.,
DON YAEGER,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(July 15, 2005)**

Before CARNES and PRYOR, Circuit Judges, and FORRESTER[*], District Judge.

CARNES, Circuit Judge:

In the Spring of 2003 Mike Price was head coach of the University of Alabama's Crimson Tide football team. Given the near-fanatical following that college football has in the South, the head coach at a major university is a powerful figure. However, as Archbishop Tillotson observed three centuries ago, "they, who are in highest places, and have the most power . . . have the least liberty, because they are most observed."[1] If Price was unaware of that paradox when he became the Crimson Tide's coach, he learned it the hard way a few months later in the aftermath of a trip he took to Pensacola, Florida.

While in Pensacola to participate in a pro-am golf tournament Price, a married man, visited an establishment known as "Artey's Angels." The name is more than a little ironic because the women who dance there are not angels in the religious sense and, when he went, Price was not following the better angels of his nature in any sense. Scandal ensued, and as often happens in our society, litigation followed closely on the heels of scandal.

---

[*] Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

[1] Thomas Birch, The Life of Dr. John Tillotson Complied Chiefly from His Original Papers and Letters, in 1 The Works of the Most Reverend Dr. John Tillotson, Lord Archbishop of Canterbury lxxix (London, J. & R. Tonson et al. 1752).

Out of that litigation came this interlocutory appeal about whether Sports Illustrated magazine and one of its writers are protected under Alabama law or by the federal Constitution from being compelled to reveal the confidential source for an article they published about Price and his activities in Pensacola. The Alabama law question centers around that state's shield statute, Ala. Code § 12-21-142; more specifically, the question is whether the word "newspaper" in the statutory phrase "newspaper, radio broadcasting station or television station" ought to be construed to include Sports Illustrated magazine. The federal constitutional question involves application of the First Amendment qualified reporter's privilege, which in this case comes down to one factor: whether Price has made all reasonable efforts to discover the identity of the confidential source in ways other than by forcing Sports Illustrated and its writer to divulge it. For reasons we will explain, we conclude that Sports Illustrated is not a newspaper for purposes of Alabama's shield law, but we also conclude that Price has not yet exhausted all reasonable efforts to discover through other means the identity of the confidential source.

## I.

Don Yaeger is a reporter for Sports Illustrated, a weekly magazine published by Time, Inc., which contains sports-related features, reports, opinions,

and advertisements.  The issue of Sports Illustrated which hit the newsstands on May 8, 2003 (but actually bore the date of May 12, 2003) contained an article written by Yaeger entitled, "Bad Behavior:  How He Met His Destiny At A Strip Club."  The "he" in the title refers to Price, and the "Destiny" reference is a double-entendre playing off the stage name of one of the strippers at Artey's Angels.  The Sports Illustrated article itself recounts allegations of boorish behavior and sexual misconduct by Price in the months following his ascension to the position of head football coach at the University of Alabama.  The article indicates that it relies on confidential sources for the most salacious parts of its content.

One of the incidents described in the article involves sexual advances Price allegedly made, shortly after he was hired in late 2002, towards some unnamed female students in a bar and at an apartment complex in Tuscaloosa, Alabama, where the University is located.  The parties refer to this as "the Tuscaloosa incident."  We need not detail any of the historical or procedural facts concerning this part of the article.  At oral argument Price's counsel informed us that since the district court's order was entered he has uncovered by other means the identity of the confidential sources for the reporting about the Tuscaloosa incident.  As the parties acknowledge, this development renders academic the issue of whether the

district court's order compelling the defendants to disclose these particular confidential sources is proper, and as a result we should vacate as moot that part of the district court's order. That is what we will do.

Price has not yet discovered the identity of the confidential source for the article's reporting on "the Pensacola incident," so that part of the district court's disclosure order is not moot. The article states that shortly after arriving in Pensacola, Florida on the afternoon of April 16, 2003, Price went to a strip club called "Artey's Angels." It says that he spent most of his time with a dancer named Lori "Destiny" Boudreaux, who is quoted in the article as saying that Price bought her drinks, tipped her $60 for "semiprivate" dances, and touched her inappropriately during those dances, which was against the house rules. Price told Destiny[2] that he had a room at a hotel in town and that he wanted her to meet him there later that night.

The article also alleges that Price visited Artey's a second time, later on the same day, after he had left the golf tournament's sponsor dinner early. The article says that while sitting at the bar in Artey's, Price was "kissing and fondling a

---

[2] In an earlier draft of this opinion, we referred to the women who worked at Artey's by their last names after the initial mention. That convention proved awkward and confusing, especially since we quote some statements about them that use only their first names. To simplify matters we've gone with their first names after the first full-name mention of each one.

5

waitress until a reminder from the deejay prompted him to stop." It describes how he continued to buy several hundred dollars worth of drinks and dances until about midnight, and finally invited two dancers back to his hotel room where the three of them supposedly had sex. The article includes this description of what allegedly occurred at Price's hotel room:

> At about midnight [after leaving the club] Price headed back to the hotel. He eventually met up with two women, both of whom he had earlier propositioned for sex, according to one of the women, who agreed to speak to SI about the hotel-room liaison on the condition that her name not be used. The woman, who declined comment when asked if she was paid for the evening, said that the threesome engaged "in some pretty aggressive sex." She said that at one point she and her female companion decided to add a little levity to the activity: "We started screaming 'Roll Tide!' and he was yelling back, 'It's rolling baby, it's rolling.'"

On May 3, 2003, five days before the article was published, Yaeger called Price to get his response to the allegations about the Pensacola incident. Yaeger asked Price if it was true that "both Jennifer (Eaton) and 'Destiny,'" two exotic dancers from Artey's Angels, "met [him] back at the hotel" after he left the club. Price expressed surprise at the allegations and asked Yaeger who had told him that. Price denied having sex with any woman in his hotel room that night. He said the allegations were "[c]ompletely not true." When asked if he had invited anyone back to his hotel room, Price said "[a]bsolutely not." Although Price initially declined to comment when Yaeger asked if he had awakened the next

6

morning with "at least one woman," Price did tell Yaeger "[t]hat story you heard is completely false." When told by Yaeger that Jennifer and Destiny claimed he had paid them $500 plus a "healthy" tip for sex, Price responded: "Well, someone bought 'em, bought 'em off because it's a lie. A flat lie."

On May 6, 2003, only two days before the magazine appeared on the newsstands, Yaeger went on the popular radio show of Paul Finebaum, a sportswriter in Birmingham, Alabama to discuss the upcoming article. Yaeger told listeners about Price's alleged hijinks in Tuscaloosa and Pensacola. The parties agree that the statements Yaeger made on the radio show are not materially different from what he said in the article.

Based on Yaeger's comments on the Finebaum show and the published article, Price sued Yaeger and Time, which is Sports Illustrated's publisher and parent company, in Alabama state court for libel, slander, and outrageous conduct. The defendants removed the lawsuit to federal court based on diversity jurisdiction.

In his complaint Price labels as "false and defamatory" most of the allegations in the Sports Illustrated article. He does admit visiting Artey's Angels once while in Pensacola for the golf tournament, but he denies everything else. In

his complaint and under oath during a deposition Price vehemently denies having sex with anyone mentioned in the article.

Price's complaint avers that the defendants "knew or had reason to know" of the "falsity and lack of verified or factual support" for Yaeger's story, and that they published the account of the incidents in Tuscaloosa and Pensacola "knowing of its sensationalizing sting and falsity with malice by intent and/or reckless disregard for the truth in an effort to increase sales and profit to the[ir] benefit." The defendants, according to Price, "created this sensational and provocative article in a malicious effort to publish untruths that were assigned to purported anonymous sources and without a full and fair investigation into the truth or veracity of the [facts in the article] in an effort to get the story to press as quickly as possible regardless of its truth and defamatory content so it would explode into the newsstands." In other words, Price claims that the defendants maliciously defamed him either by lying about having a confidential source, or by relying exclusively on a confidential source that they knew, or should have known, to be untrustworthy.

In his first set of interrogatories, Price asked the defendants to identify the confidential sources who furnished the information upon which the article's statements about the Tuscaloosa and Pensacola incidents were based. They

8

objected, asserting that Alabama's shield statute, Ala. Code § 12-21-142, and the First Amendment qualified reporter's privilege protected them from having to reveal the sources' identities. Price moved to compel answers to his interrogatory and thereby force the defendants to disclose the identities of the confidential sources.

In the meantime, Price continued with discovery, taking a number of depositions. In Yaeger's deposition, he testified that he had only one source for the Pensacola incident and she told him that she had met Price at Artey's Angels and then had gone back to Price's hotel room the night of April 16, 2003. According to Yaeger, his source told him that Jennifer and Destiny were the two women who had "aggressive sex" with Price that night in Pensacola, and she also told him that Price had paid each of the two women $500 for their services. This part of Yaeger's deposition testimony was consistent with what he had told Price on May 3, 2003, the one time they had spoken before the article was published.

Some of Yaeger's deposition testimony, however, is not so good for the defense side on the actual malice issue. The chronology of publication is this: Yaeger sent the article to Sports Illustrated's headquarters in New York for publication on May 5, 2003; it went to press at midnight on that date; and it was out on the newsstands on May 8, 2003. Yaeger testified that on May 6, 2003,

9

which was after the article had gone to press, he spoke for the first time with Jennifer, the woman his confidential source had identified as one of the two women in Price's hotel room in Pensacola. Jennifer told him that she was the only woman in Price's hotel room that night, and she denied having sex—aggressive or otherwise—with Price.

Yaeger also testified that later on the same day after interviewing Jennifer, he went back to his confidential source. He asked his source if it was possible that instead of Jennifer another dancer at Artey's, Tracy Brigalia, was one of the two women in the room with Price. The confidential source "indicated that it might have been somebody other than Jennifer." Two days later, on May 8, the day the magazine went on the newsstands, Yaeger interviewed Nicole Saldano for the first time. She was Tracy's roommate, and she told Yaeger that Tracy had been in Price's hotel room on the night in question, but Nicole wasn't sure if the two had sex.

Explaining why he conducted the interviews with Jennifer and Nicole—after the magazine went to press—Yaeger claimed that it was "about trying to make sure that we were right," and "if we were following up with a second story, we wanted to make sure that we had correct information to make corrections, if necessary." However, nowhere in the record before us does Yaeger

10

offer any explanation for his failure to check his sensational story with those two witnesses before it was too late to make any corrections. In any event, as a result of his interviews with Jennifer and Nicole, Yaeger became unsure of his confidential source's version of events, the version reflected in the article that had been published. Yaeger testified in his deposition that he now believes "that the confidential source was in the room, and I believe there is a pretty solid chance that Tracy Brigalia was in the room."

Yaeger's "pretty solid chance" version not only varies from what his confidential source initially told him, it also differs from what Destiny said in a tape-recorded conversation. Between the first and second days of Yaeger's deposition, Price's counsel telephoned Destiny and asked her about the allegations. She told counsel: "Yeah, it wasn't me [in the hotel room], I know for a fact. I know for definite sure. Jennifer, yeah, and Tracy, yeah. I know—I know they were in the room. I mean, I don't know for a fact, but I heard it from their mouths, so." After hearing the tape recording of that conversation played at his deposition, Yaeger responded that Destiny had not been telling the complete truth in it.

After hearing argument and considering Yaeger's deposition testimony, the district court concluded that Alabama's shield law did not apply to magazine

11

reporters like Yaeger, and that Price had made a sufficient showing to overcome the First Amendment qualified reporter's privilege that the defendants had asserted. Price v. Time, Inc., No. Civ.A. CV03S1868S, 2003 WL 23273874, at *2–6, 6–9 (N.D. Ala. Dec. 8, 2003). Based on those conclusions, the court granted Price's motion to compel the defendants to answer Price's interrogatories seeking the identity of the confidential sources. Id. at *9–10.

Thereafter, the district court reconsidered, stayed its initial order, and certified to the Alabama Supreme Court the following state law question: "Does the exemption from disclosing sources of information found in Alabama Code § 12-21-142 apply to a person 'engaged in, connected with or employed on any [magazine], while engaged in a news-gathering capacity'?" Price v. Time, Inc., 304 F. Supp. 2d 1294, 1309 (N.D. Ala. 2004) (alteration in original). The district court explained that certification was appropriate because there was "no clear, controlling, precedents in the decisions of the Supreme Court of Alabama on this issue, and its significance extends beyond this case." Id. at 1297; see also Blue Cross & Blue Shield of Ala., Inc. v. Nielsen, 116 F.3d 1406, 1413 (11th Cir. 1997) ("The final arbiter of state law is the state supreme court, which is another way of saying that Alabama law is what the Alabama Supreme Court says it is.").

To the disappointment of the district court (and this one as well), the Alabama Supreme Court declined to answer the certified question, as it had every right to do and has done on occasion before. See Nielsen, 116 F.3d at 1413. That left the district court with no choice but to answer the state law question itself, which it had already done in its initial order and opinion. The court vacated its original order granting Price's motion to compel, but issued a new one reaching the same result. In an opinion accompanying its new order the court expanded on the reasoning it had earlier given for rejecting the defendants' contentions that the identities of the confidential sources were protected from disclosure by Alabama's shield law and by the First Amendment.

The district court then granted the defendants' motion to certify the two privilege issues for interlocutory appeal under 28 U.S.C. § 1292(b), and a panel of this Court granted an application permitting the appeal. The district court has stayed all proceedings in the case pending our decision.

**II.**

We review de novo the district court's determination of state law. Salve Regina Coll. v. Russell, 499 U.S. 225, 231, 111 S. Ct. 1217, 1221 (1991); Overseas Private Inv. Corp. v. Metro. Dade County, 47 F.3d 1111, 1113 (11th Cir. 1995). The goal of a federal court deciding a state law issue is to resolve it the

same way the state's highest court would.  Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1290 (11th Cir. 2001).  Our review of the federal constitutional privilege issue is also de novo.  See In re Grand Jury Matter No. 91-01386, 969 F.2d 995, 997 (11th Cir. 1992); In re Grand Jury Proceedings 88-9 (MIA), 899 F.2d 1039, 1042 (11th Cir. 1990).  The exception to our statements about de novo review is that we review only for clear error any subsidiary fact findings the district court made in the course of its rulings.  See Miller v. Transamerican Press, Inc., 621 F.2d 721, 726 (5th Cir.), modified on reh'g, 628 F.2d 932 (5th Cir. 1980) (per curiam)[3]; see also Wilson v. Minor, 220 F.3d 1297, 1301 (11th Cir. 2000).

At oral argument Price acknowledged that what Yaeger said on the Finebaum radio show added nothing material to what is contained in the magazine article.  And, as we've already noted, Price has discovered the identity of the confidential sources for the Tuscaloosa incident.  The combined effect of these developments is to narrow this appeal to the state and federal law privilege issues involving the confidential source for the part of the magazine article describing the Pensacola incident.  Does Alabama's shield statute or the First Amendment

---

[3] Fifth Circuit decisions rendered prior to the close of business on September 30, 1981 are binding precedent on this Court.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

14

qualified reporter's privilege protect the defendants from being compelled to reveal the confidential source for the statements made in the Sports Illustrated article about Price's alleged sexual shenanigans in Pensacola?

## III.

We take up the state shield law first, because it bestows an absolute privilege which, if applicable, would end the matter. State privilege defenses have full force and effect in federal court in diversity jurisdiction cases by virtue of Fed. R. Evid. 501.[4] If the Alabama courts would apply that state's shield law in this case if it had not been removed to federal court, then we must apply it; if they would not, then we must not. Our task is to decide whether Alabama's courts would apply the shield law to magazine reporters and publishers.

The statute in question was originally enacted in 1935 with the express purpose of "safeguard[ing] and protect[ing] the professional confidence of newspaper and newspapermen." 1935 Ala. Acts 649. Fourteen years later, the Alabama Legislature extended the privilege to radio broadcast and television station reporters. 1949 Ala. Acts 548. Magazines and magazine reporters were

---

[4] "[I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law." Fed. R. Evid. 501.

not mentioned in the original statute or the 1949 amendment, and the statute has

not been changed since then. This is what it has said for the past fifty-six years:

> No person engaged in, connected with or employed on <u>any newspaper, radio broadcasting station or television station</u>, while engaged in a news-gathering capacity, shall be compelled to disclose in any legal proceeding or trial, before any court or before a grand jury of any court, before the presiding officer of any tribunal or his agent or agents or before any committee of the Legislature or elsewhere the sources of any information procured or obtained by him and published in the newspaper, broadcast by any broadcasting station, or televised by any television station on which he is engaged, connected with or employed.

Ala. Code § 12-21-142 (emphasis added). Is the magazine <u>Sports Illustrated</u>

covered by the statutory phrase "any newspaper, radio, broadcasting station or

television station" so that the article about Price published in that magazine was

published in "any newspaper"?

In construing this statute we begin where we believe the Alabama Supreme

Court would, which is looking for legislative intent in the plain meaning of the

statutory language. As that Court has explained, "[t]he fundamental rule of

construction is to ascertain and effectuate the intent of the Legislature as expressed

in the statute," <u>League of Women Voters v. Renfro</u>, 290 So. 2d 167, 169 (Ala.

1974), and "[i]f possible, the intent of the legislature should be gathered from the

language of the statute itself," <u>Clark v. Houston County Comm'n</u>, 507 So. 2d 902,

903 (Ala. 1987) (per curiam). "When the language of a statute is plain and

16

unambiguous . . . courts must enforce the statute as written by giving the words of the statute their ordinary plain meaning—they must interpret that language to mean exactly what it says . . . ." T.B. v. State, 698 So. 2d 127, 130 (Ala. 1997).

"In determining the meaning of a statute," the Alabama Supreme Court has said that it "looks to the plain meaning of the words as written by the legislature." DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So. 2d 270, 275 (Ala. 1998). The Court gives words their ordinary meaning and does not impart its own views as the intent of the legislature:

> Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.

IMED Corp. v. Sys. Eng'g Assocs. Corp., 602 So. 2d 344, 346 (Ala. 1992), quoted in Blue Cross & Blue Shield v. Nielson, 714 So. 2d 293, 296 (Ala. 1998).

The defendants do not quarrel with the primacy of the plain meaning rule when it comes to statutory construction in Alabama courts. They quibble instead with the proposition that "any newspaper" plainly does not include their magazine. The United States Supreme Court and this Court have recognized on many occasions that the word "any" is a powerful and broad word, and that it does not

17

mean "some" or "all but a few," but instead means "all." E.g., United States v. Gonzales, 520 U.S. 1, 5, 117 S. Ct. 1032, 1035 (1997); United States v. Alvarez-Sanchez, 511 U.S. 350, 358, 114 S. Ct. 1599, 1604 (1994); CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1223 (11th Cir. 2001); Coronado v. Bank Atl. Bancorp, Inc., 222 F.3d 1315, 1321–22 (11th Cir. 2000); Merritt v. Dillard Paper Co., 120 F.3d 1181, 1185–86 (11th Cir. 1997). While the scope of the "any" adjective is plenty wide to sweep in all of the noun category that follows, it ordinarily does not sweep beyond that category. The term "any dog" does not mean "any dog or cat" unless a cat is a dog. Likewise, the term "any newspaper" does not mean "any newspaper or magazine," unless a magazine is a newspaper. So, we are back where we started, looking for the plain meaning of the word "newspaper."

It seems to us plain and apparent that in common usage "newspaper" does not mean "newspaper and magazine." There are some meanings so plain that no further discussion should be necessary, but sometimes judges and lawyers act like lay lexicographers, love logomachy, and lean to logorrhea. And so it is here. The lawyers representing the defendants insist that "newspaper" means more than newspaper, the more being magazine. They cite two dictionaries and a couple of thesauri in support of their position. Their dictionary cites are fair enough—we'll

18

get to them later—because dictionaries are sometimes cited to and by courts, including the Alabama Supreme Court. The thesauri cites are another matter.

The defendants cite Roget's 21st Century Thesaurus in Dictionary Form 573 (1992), and Merriam-Webster's Collegiate Thesaurus 505 (1988), because those books list magazine as one synonym of "newspaper." To begin with, the defendants are guilty of selective synonymizing. Most thesauri don't list magazine as a synonym for "newspaper." See, e.g., The Penguin Roget's College Thesaurus in Dictionary Form 464 (2001); The Oxford American Thesaurus of Current English 499 (1999); Roget's International Thesaurus 399 (5th ed. 1992).

More fundamentally, a thesaurus is not a dictionary. It does not purport to define words but instead suggests synonyms and antonyms. A synonym is not a definition because words that are similar can, and often do, have distinct meanings. To illustrate the problems with the definition-by-thesauri approach, we note that the listing of "newspaper" that the defendants cite from Roget's 21st Century Thesaurus in Dictionary Form also indicates that "scandal sheet" is a synonym of "newspaper." Id. at 573. We doubt that most publishers of newspapers or magazines would define their product as a scandal sheet. Another example of the perils of using a thesaurus to define can be found when one looks up "lawyer." Among the listed synonyms in one thesaurus are "fixer,"

19

"mouthpiece," "ambulance chaser," and "shyster." Roget's International Thesaurus, supra, at 422–23. We doubt that counsel would concede that those synonyms define lawyers.

The use of dictionaries to define words used in statutes is, of course, a more accepted and more defensible approach to determining the plain meaning of statutory language. Dictionaries have been employed for that purpose by the Alabama Supreme Court from time to time, and that Court has used both general purpose dictionaries and legal dictionaries. See, e.g., Webb Wheel Prods., Inc. v. Hanvey, ___ So. 2d ___, 2005 WL 1316997, *8 (Ala. June 3, 2005) (per curiam) (using Black's Law Dictionary to determine the "plain meaning" of an Alabama statutory term); Northcom, Ltd. v. James, 848 So. 2d 242, 246–47 (Ala. 2002) (same); Yu v. Stephens, 591 So. 2d 858, 860 & n.1 (Ala. 1991) (same); Pardue v. State, 797 So. 2d 409 (Ala. 2000) (using Merriam Webster's Collegiate Dictionary to define an Alabama statutory term); Bassett v. Newton, 658 So. 2d 398, 401 (Ala. 1995) (using Webster's New World Dictionary of the American Language to define an Alabama statutory term); Williams v. Water Works & Gas Bd., 519 So. 2d 470, 471 (Ala. 1987) (using Ballentine's Law Dictionary to determine the "plain and usual meaning" of an Alabama statutory term); Darby v. State, 516 So. 2d 786, 788 (Ala. 1987) (using Webster's Third New International Dictionary to

define an Alabama statutory term); O'Neal v. Macon County Bd. of Educ., 484 So. 2d 401, 402–03 (Ala. 1986) (using Ballentine's and Black's to define an Alabama statutory term). Accordingly, we will look at both types of dictionaries to determine the "natural, plain, ordinary, and commonly understood meaning" of the word "newspaper." Nielson, 714 So. 2d at 296.

A review of legal dictionaries yields a result that is not helpful to the defendants' position that Sports Illustrated is a newspaper. In its most recent edition, Black's defines "newspaper" as "[a] publication for general circulation, usu. in sheet form, appearing at regular intervals, usu. daily or weekly, and containing matters of general public interest, such as current events." Black's Law Dictionary 1069 (8th ed. 2004). Ballentine's has a similar definition. Ballentine's Law Dictionary 848 (3d ed. 1969) ("A publication appearing at regular, or almost regular, intervals at short periods of time, as daily or weekly, usually in sheet form, and containing news . . . ."). This definition of "newspaper" tends not to cover Sports Illustrated, which is not in sheet form but instead is stapled and bound into individual pages, as magazines usually are.

The defendants do not cite Black's, Ballentine's, or any other legal dictionary for their position that the magazine is a newspaper. Instead, they cite two general dictionaries. One of those dictionaries defines the word "newspaper"

21

as including "a paper that is printed and distributed daily, weekly, or at some other regular and usu. short interval and that contains news, articles of opinion (as editorials), features, advertising, or other matter regarded as of current interest." Webster's Third New International Dictionary of the English Language Unabridged 1524 (1993), cited in Appellants' Br. at 32. A problem with this definition is that it is not entirely clear to us a magazine is "a paper." If it is not, the definition would not cover Sports Illustrated magazine.

The other non-legal dictionary that the defendants cite defines "newspaper" as: "A printed, now usually daily or weekly, publication containing the news, commonly with the addition of advertisements and other matters of interest." 10 Oxford English Dictionary 376 (2d ed. 1989), cited in Appellants' Br. at 32. That helps the defendants some, but the problem here is cherrypicking. As one court has explained, "[g]iving determinative weight to one dictionary's definition of a term, when other dictionaries define the term in a quite different manner, may very well exceed the bounds of the permissible." Theiss v. Principi, 18 Vet. App. 204, 211 (2004) (quotation omitted). That is what we have here. The most recent edition of the OED defines "newspaper" as: "A printed publication, now usually issued daily or weekly, consisting of folded unstapled sheets and containing news, freq. with the addition of advertisements, photographs, articles, and

correspondence . . . ." Oxford English Dictionary Online (draft rev. 2005), at http://dictionary.oed.com. Of course, Sports Illustrated does not consist of folded unstapled sheets. Instead, it is, as another dictionary defines "magazine": "[A] periodical (generally published weekly, biweekly—once every two weeks—monthly, or bimonthly), 7" x 10" or other dimension smaller than a full-size newspaper, usually printed on coated, or shiny, paper . . . ." Webster's New World Dictionary of Media and Communications 354 (rev. ed. 1996). Incidentally, that same definition goes on to list Sports Illustrated as an example of a magazine. Id.

Although the defendants cite only modern dictionaries and neither party suggests that the definition of "newspaper" has changed since the legislature used the term, we have checked dictionaries in existence at the time the statute was enacted in 1935 to see if there has been any change in the meaning of "newspaper" since then. See Amoco Prod. Co. v. S. Ute Indian Tribe, 526 U.S. 865, 873–74, 119 S. Ct. 1719, 1724 (1999); State Dep't of Revenue v. Sonat, Inc., 690 So. 2d 412, 418 (Ala. Civ. App. 1997). We have done so because changes in the definition of a key term over the years can affect our understanding of the intent of the legislature at the time of enactment, which is what counts. See generally League of Women Voters, 290 So. 2d at 169. In this case, the key definition has

23

not changed from the time the Alabama shield statute was enacted in 1935.  The

1933 edition of Black's Law Dictionary, for instance, defined a newspaper as "a

publication in numbers, consisting commonly of single sheets, and published at

short and stated intervals, conveying intelligence of passing events."   Black's

Law Dictionary 1241 (3rd ed. 1933).  Similarly, the definition of newspaper in the

1930 edition of Ballentine's was the same then as it is now.  See Ballentine's Law

Dictionary 867 (1st ed. 1930).

Moving from dictionaries, other reference works also define "newspaper" in

ways that exclude Sports Illustrated.  The Cambridge Encyclopedia 779 (4th ed.

2000), and The Penguin Encyclopedia 1083 (rev. 2d ed. 2004), define

"newspaper" as "[a] regularly published account of recent events" that is "printed,

usually by offset lithography, on large sheets, folded once and inserted one within

another, and published at daily, weekly, or (occasionally) monthly frequencies."

The Encyclopedia Americana defines "newspaper" as "an unbound publication

issued at regular intervals that seeks to inform, explain and interpret, influence,

and entertain."  20 The Encyclopedia Americana International Edition 278 (1999).

Unlike a newspaper, Sports Illustrated is bound and is not printed on large sheets.

In any event, the plain meaning, the common understanding, of the term

"newspaper" need not be confined to a duel of dictionaries or a rumble of

reference works.  See 2A Normal J. Singer, <u>Sutherland on Statutes and Statutory</u> <u>Construction</u> § 46:2 (6th ed. 2005) ("[I]t should be noted that dictionary definitions do not necessary reflect the legislature's intention in enacting statutes.").  There is also the generally accepted usage in the trade.  Alabama courts have looked to the common understanding of the industry when deciphering terms in a statute.  See <u>State Dept. of Revenue v. Delta Air Lines, Inc.</u>, 549 So. 2d 1352, 1354 (Ala. Civ. App. 1989).

The common understanding of the publishing industry clearly is that magazines like <u>Sports Illustrated</u> are not newspapers.  Consider the Pulitzer Prize in Journalism, which is the nation's most prestigious prize for newspaper content. See <u>Maudlin v. Comm'r of Internal Revenue</u>, 60 T.C. 749, 751 (1974) (recognizing the Pulitzer Prize as "journalism's highest honor").  It is awarded to "material appearing in a United States newspaper published daily, Sunday or at least once a week during the calendar year."  <u>Journalism Guidelines for Pulitzer</u> <u>Prizes</u>, <u>at</u> http://www.pulitzer.org.  The Pulitzer guidelines do not define "newspaper," probably because those in the business do not need to define the term that defines their business.  They know what a newspaper is.  And the eighty-eight year history of the Pulitzer Prize awards to newspapers shows what one is, and is not.  None of the more than 650 Pulitzer Prize awards for "material

25

appearing in a United States newspaper" published at least once a week has ever been awarded to Time, Newsweek, or U.S. News & World Report, the nation's three largest weekly magazines. And none has ever gone to Sports Illustrated, which is also a weekly. The reason is plain: magazines are not recognized in the journalism category of the Pulitzer Prize, because that category is restricted by the rules to newspapers, and weekly magazines are not newspapers.

The magazine industry has its own Pulitzer-like award—the National Magazine Awards, or "Ellies," sponsored by the American Society of Magazine Editors. "Any magazine edited, published, and sold in the U.S. is eligible" for an Ellie. Rules of Eligibility for National Magazine Awards, at http://www.magazine.org/Editorial/National_Magazine_Awards/Rules_for_ Eligibility. "To be considered a magazine, a publication must be issued at regular intervals at least four times a year and must be distributed or sold independently of other publications. Newspaper supplements, in-house company publications, newsletters, and foreign-language publications are not eligible." Id. In the forty-year history of the Ellies, the big three—Time, Newsweek, and U.S. News & World Report—have won twenty National Magazine Awards. See National Magazine Awards Database of Past Winners and Finalists, at http://www.magazine.org/Editorial/National_Magazine_Awards/searchable_

Database.  Sports Illustrated itself has won nine.  See id.  By contrast, the Wall Street Journal, the Washington Post, and the New York Times, have never won the magazine industry's highest honor.  See id.  The reason is plain:  the industry recognizes that newspapers are not magazines.

Industry recognition of the distinct meaning of "newspaper" and "magazine" shows in more than the award of prizes; it shows, too, in trade association membership.  The Newspaper Association of America was formed in 1992, by the merger of seven associations, including the American Newspaper Publishers Association which was founded in 1887, almost fifty years before the enactment of the Alabama shield law.  NAA Introduction, at http://www.naa.org/docpage.cfm.  The NAA "is a nonprofit organization representing the $55 billion newspaper industry and over 2,000 newspapers in the United States and Canada."  NAA Membership, at http://www.naa.org/member-ships.cfm.  It represents newspapers with a combined total of about ninety percent of all newspaper circulation in the country, including the Wall Street Journal, the Washington Post, and the New York Times.  Id.; see also Amici Br. at A4.  Tellingly, the Newspaper Association of America does not include within its membership Time, Newsweek, or Sports Illustrated.  See NAA Membership, supra.

They all belong to a separate group, the Magazine Publishers of America, which was formed in 1919 — sixteen years before the enactment of the Alabama shield law — as the "premier trade association for the consumer magazine industry." Membership for Magazine Publishers of America, at http://www.magazine.org/membership/index.cfm; MPA Membership Directory, at http://members.magazine.org/scriptcontent/index_member_directory.cfm. This association's membership includes "magazine publishers in the US and abroad." Membership for Magazine Publishers of America, supra; see also Amici Br. at A3.

The point is that magazines are not members of the Newspaper Association of America, and newspapers are not members of the Magazine Publishers Association. Both associations predate (counting the NAA as a direct descendent of the American Newspaper Publishers Association) the Alabama shield statute; the publishers of the two different types of publications organized separately well before the enactment of the statute. When it comes to organizing the publishing industry, publishers recognize what is what and which is which. They know that a magazine is not a newspaper.[5]

---

[5] Taking a position that is rich with inconsistency and borders on self-denial, the Newspaper Association of America and the Magazine Publishers Association have joined an amici brief filed on behalf of the defendants, which espouses the argument that magazines ought to be included in the term "newspaper" for purposes of the present case. So far as we can tell, no plans are underway to merge those two associations with their distinct memberships.

There is another way to find out whether Sports Illustrated is a newspaper within the plain, ordinary, everyday, common sense meaning of that term, and that is to ask it. At oral argument we asked counsel whether his client, Sports Illustrated, in its fifty-year history had ever once referred to itself as a newspaper, and his answer was: "No." Sports Illustrated knows it is not a newspaper.

All of these considerations compel our conclusion that the plain meaning of the term "newspaper" does not include the magazine Sports Illustrated, and that conclusion is enough to define the legislative intent behind the Alabama shield statute. But there is more. Over the years the Alabama Legislature has recognized that magazines are not newspapers. It has repeatedly used both terms in the same statute, something that would have been entirely unnecessary if one term included the other. The district court found, cited, and quoted the relevant passages from twenty Alabama statutes that include both "newspaper" and "magazine." Price, 304 F. Supp. 2d at 1304–05; see e.g., Ala. Code § 8-19A-4(6) ("The provisions of this chapter do not apply to: (6) A person primarily soliciting the sale of a newspaper, periodical of general circulation, or magazine"); id. § 13A-9-44 ("A television or radio broadcasting station, or a publisher or printer of a newspaper, magazine or other form of printed advertising, which broadcasts, publishes or prints a false advertisement or a bait advertisement . . . . without knowledge of the

advertiser's or subscriber's intent, plan or purpose, does not commit a crime . . . ."); id. § 28-3-16 ("There shall be no advertising of alcoholic beverages, as enumerated and defined in this chapter, except through newspapers, magazines, radio broadcasting stations, commercial vehicles used for transportation of alcoholic beverages and billboards located in 'wet' counties . . . .").

While these twenty statutes do not contain explicit definitions of the term "newspaper," they do demonstrate that the Alabama Legislature must not define the word to include magazine, or it would not have felt the need to include both terms in all of those statutes. The earliest of the statutes was enacted by the legislature in 1951, just two years after the amendment to the shield law. Id. § 38-1-4(c). These twenty statutes show that the Alabama Legislature knows how to include the term "magazine," along with the term "newspaper," when it intends for a statute to cover magazines as well as newspapers, and one of the statutes shows that the Legislature was doing just that around the time the shield law was amended. These statutes strongly support the inference that if the Alabama Legislature had meant to bring magazines within the scope of the shield statute it would have said "magazines" and "newspapers" just as it has done in at least twenty other statutes.

Our conclusion about what these other twenty statutes mean is consistent with the Alabama Supreme Court's presumption that every word in a statute has "some force and effect" and that no superfluous words are used. See Richardson v. Stanford Props., LLC, 897 So. 2d 1052, 1058 (Ala. 2004); Simcala, Inc. v. Am. Coal Trade, Inc., 821 So. 2d 197, 200 (Ala. 2001); Uniroyal Tire Co. v. State Dep't of Revenue, 779 So. 2d 227, 236 (Ala. 2000). Only by recognizing the separate meanings of the terms "newspaper" and "magazine" can we give the requisite "force and effect" to both words throughout the Alabama Code. Adopting the defendants' position that "newspaper" includes magazines would render superfluous the term "magazine" where it is used along with "newspaper" in those twenty statutes throughout the Alabama Code. The Alabama Supreme Court would not adopt a construction that did that.

The defendants attempt to redirect the inquiry away from plain meaning by asserting that if we don't construe the shield statute to cover magazines there will be First Amendment and Equal Protection Clause problems arising from that law's differential treatment of the media. Their argument relies on the canon that statutes ought to be construed to avoid constitutional problems where possible. Courts employ the canon of constitutional avoidance as "a tool for choosing between competing plausible interpretations of a statutory text . . . ." Clark v.

31

Martinez, ___ U.S. ___, 125 S. Ct. 716, 724 (2005). Courts do not use this tool when the text of the statute is unambiguous. See id. n.5 (citing Salinas v. United States, 522 U.S. 52, 60, 118 S. Ct. 469, 475 (1997)). The defendants argue that because the meaning of the term "newspaper" is susceptible to two plausible, but competing interpretations, we should chose their preferred definition and interpret "newspaper" broadly to avoid a constitutional problem.

The first premise of that argument is wrong. The use of the term "newspaper" is not ambiguous. General dictionaries, legal dictionaries, other reference works, the common understanding of the publishing industry, Sports Illustrated's own understanding of itself, and twenty other statutes enacted by the Alabama Legislature all establish that Sports Illustrated magazine is not a newspaper. It is not plausible to interpret the term "newspaper" in the Alabama shield statute to include Sports Illustrated magazine. The term is not ambiguous. The Alabama Supreme Court would not stretch the canon of constitutional avoidance far enough to make a difference affecting Sports Illustrated, which would essentially require adding the word "magazine" to the statute. See McCall v. Automatic Voting Mach. Corp., 180 So. 695, 697 (Ala. 1938) ("[C]ourts are not at liberty in order to sustain a statute to give it a forced construction or to read into

32

it and interpolate words which do not appear in the language enacted by the Legislature.").

Our conclusion is reinforced by another canon of statutory construction which we are convinced the Alabama courts would apply in this situation. Under Alabama law, "[s]tatutes in derogation or modification of the common law are strictly construed. Cook v. Meyer, 73 Ala. 580 (1883). Statutes are presumed not to alter the common law in any way not expressly declared. Pappas v. City of Eufaula, 210 So. 2d 802 (Ala. 1968)." Arnold v. State, 353 So. 2d 524, 526 (Ala. 1977); see also Key v. State, 890 So. 2d 1056, 1060 (Ala. 2003). Or put it a little differently, the common law prevails unless changed by statute, Cook, 73 Ala. at 583, and "[a] statute which is an innovation upon the common law will not be extended further than is required by the letter of the statute." Pappas, 210 So. 2d at 804.

The Alabama shield law is "in derogation or modification of the common law." Arnold, 353 So. 2d at 526 (citations omitted). At common law, a reporter did not have a privilege to withhold the identity of a confidential source of information, and a court could compel disclosure in proceedings before a court, grand jury, or other governmental body. See Branzburg v. Hayes, 408 U.S. 665, 685, 698 92 S. Ct. 2646, 2659, 2665 (1972). This common law is reflected in the

Alabama Rules of Evidence which state that "[e]xcept as otherwise provided by constitution or statute . . ., no person has a privilege to: . . . (2) refuse to disclose any matter." Ala. R. Evid. 501. Because the common law is that there is no confidential source privilege, Alabama courts would construe the shield statute, which provides one, narrowly. Arnold, 353 So. 2d at 526 (privilege allowing husband and wife to testify for or against each other). Where there is any doubt about the meaning of statutes in derogation of the common law, Alabama courts interpret the statute to make the least, rather than the most, change in the common law. See id.; Key, 890 So. 2d at 1060; Grant v. State Dept. of Human Res., 560 So. 2d 1050, 1052 (Ala. Civ. App. 1989).

For all of these reasons, the absolute privilege of the Alabama shield law does not apply in this case. We next turn to the limited privilege the First Amendment offers for protection of a reporter's confidential sources.

## IV.

This Court has held that "a reporter has a First Amendment privilege which protects the refusal to disclose the identity of confidential informants." Miller v. Transamerican Press, Inc., 621 F.2d 721, 725 (5th Cir.) ("Miller I") (citing Branzburg v. Hayes, 408 U.S. 665, 92 S. Ct. 2646 (1972)), modified on reh'g, 628 F.2d 932 (5th Cir. 1980) (per curiam) ("Miller II"). But see Storer

Communications, Inc v. Giovan, 810 F.2d 580, 584 (6th Cir. 1987) (refusing to find a First Amendment qualified reporter's privilege from Branzburg). We have also held, however, that "the privilege is not absolute." Miller I, 621 F.2d at 725. It may be pierced if the party seeking the reporter's confidential source presents: "substantial evidence[:] [1] that the challenged statement was published and is both factually untrue and defamatory; [2] that reasonable efforts to discover the information from alternative sources have been made and that no other reasonable source is available; and [3] that knowledge of the identity of the informant is necessary to proper preparation and presentation of the case." Miller II, 628 F.2d at 932; accord United States v. Caporale, 806 F.2d 1487, 1504 (11th Cir. 1986) ("The standard governing the exercise of reporter's privilege as articulated in Miller[], provides that information may only be compelled from a reporter claiming privilege if the party requesting the information can show that it is highly relevant, necessary to the proper presentation of the case, and unavailable from other sources.").

We think a full discussion of the Miller decision is worthwhile, because the issues in that case closely parallel those in this one and that decision is binding precedent. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). The Miller case was about an article in Overdrive, a magazine for

35

members of the Teamsters union.  Miller I, 621 F.2d at 722.  The article suggested that Dusty Miller, secretary-treasurer of the union, had improperly borrowed $1.6 million from the Teamsters' pension fund with no intention of repaying the loan.  Id. at 723.  Miller denied the allegations and sued Overdrive's publisher, Transamerican Press, Inc., and its editor, Mike Parkhurst, for libel.  Id. at 722–23.

During discovery, Miller learned from Parkhurst and the author of the article that the source for the offending passage was a confidential informant.  Id. at 722.  Miller then moved to compel disclosure of the source, but the district court rejected his motion in part because Transamerican Press "claimed that Morris Shenker, a trustee of the pension fund . . . would be in a position to say whether Miller had pocketed any of the $1.6 million in loans."  Id. at 723.  Because the court thought that there was a way to independently verify the truth of the libelous allegations in the article, the court held that it was not necessary to force Transamerican Press to reveal its source.  See id.

"Miller then submitted written interrogatories to Shenker, who answered that, to his knowledge, Miller had never borrowed any money from the Central States Pension Fund."  Id.  That meant Shenker could not independently verify the allegedly libelous assertions, which would have rendered it unnecessary to know the identity of the confidential source.  Because Shenker's answer was limited to

his knowledge, Miller could not rely on it alone to establish the falsity of the allegations. And without knowing the identity of the confidential source, he had no way to prove that Transamerican Press acted with malice in printing the story. Miller went back to the district court and again asked it to compel Transamerican Press to reveal the confidential source. Id. This time, the district court "ordered disclosure, concluding that the informant's identity went to the heart" of Miller's libel claim. Id. It then certified its disclosure order for interlocutory appeal under 28 U.S.C. § 1292(b).

The former Fifth Circuit held that Transamerican Press did have a First Amendment privilege, but that "the privilege is not absolute and [that] in a libel case as is here presented, the privilege must yield." Id. at 725. The Court relied on Miller's "affidavit swearing that the charges were false," id. at 723, to conclude that he had presented substantial evidence that the allegations in the article were false and defamatory, id. at 726–27; see also Miller II, 628 F.2d at 932. Moreover, the Court agreed with the district court that all alternative means to independently confirm the allegations had been exhausted. Miller I, 621 F.2d at 726. Miller had asked Shenker, the one person Transamerican Press had suggested would be able to confirm the allegations, whether they were true, and Shenker had denied under oath any knowledge of them. Id. at 723. Finally, the Court concluded that,

37

because "Transamerican [Press]'s only source for the allegedly libelous comments is the informant," it follows that "[t]he only way that Miller can establish malice and prove his case is to show that Transamerican [Press] knew the story was false or that it was reckless to rely on the informant." Id. at 726. "In order to do that," the Court explained, "he must know the informant's identity." Id. at 726–27.

This is the framework that we must apply in the present case in order to decide whether the First Amendment qualified reporter's privilege protects the defendants from revealing the confidential source for the part of the Sports Illustrated article about the Pensacola incident. Applying the same framework, the district court decided that: Price had presented substantial evidence that the Sports Illustrated article contained false and defamatory statements; Price was unable to find a reasonable alternative means to learn Yaeger's confidential source for the Pensacola incident; and, Price had established a compelling need for the information. On that basis, the district court ruled that the qualified privilege must yield in light of the showing that Price had made. The defendants disagree, contending that Price has not met any of the three requirements of the Miller test.

Price has met the first requirement. His own sworn testimony is enough to supply substantial evidence that the statements about his behavior during the Pensacola incident are false. The Miller decision establishes as much, because it

38

relied exclusively on the plaintiff's affidavit denying the statements in the article for its conclusion that there was substantial evidence the allegations were false and defamatory. See id. at 723, 726. The plaintiff could submit no other evidence of the false or defamatory nature of the article, the Court explained, because "[t]he only evidence within the plaintiff's control that could disprove the story was his own testimony." Id. at 726 (discussing Carey v. Hume, 492 F.2d 631 (D.C. Cir. 1974)).

In addition to being binding on us, this holding from Miller makes sense. Unless he can produce a third-party witness who says that the libel plaintiff didn't do what he is alleged to have done, the plaintiff who does not know the source of the allegations against him ordinarily can prove their falsity only by denying them under oath. To hold that testimony under oath by an interested party cannot be substantial evidence of a fact in that party's favor would undermine much of the law on summary judgment. Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving. See generally, e.g., Delancy v. St. Paul Fire & Marine Ins. Co., 947 F.2d 1536, 1553 (11th Cir. 1991); United States v. Davis, 809 F.2d 1509, 1512–13 (11th Cir. 1987). Legions of criminal defendants have been found guilty beyond a reasonable doubt on the testimony of witnesses who had everything to gain from

39

implicating the defendants in crimes.  See generally United States v. Lowery, 166

F.3d 1119, 1123–24 (11th Cir. 1999) (testimony of co-conspirators in return for

sentencing considerations is a common place feature of criminal trials that

"happens every work day in federal trial courts around this country").

Price testified during his deposition that the Pensacola incident did not

happen.  He testified that he did not have sex with any woman while in Pensacola.

No third-party witness has surfaced.  Price does not know who the confidential

source is.  As in Miller, the "only evidence within the plaintiff's control that could

disprove the story [is] his own testimony."  See Miller I, 621 F.2d at 726.  That

testimony is, for Miller purposes, substantial evidence that the allegations in the

Sports Illustrated article are false and defamatory.

Skipping ahead momentarily to the third Miller requirement, Price must

show "that knowledge of the identity of the informant is necessary to the proper

preparation and presentation of the case."  Miller II, 628 F.2d at 932.  It

undoubtedly is.  As a public figure Price has to show actual malice, which means

that he must show by clear and convincing evidence that the defendants published

the defamatory statements about him either with actual knowledge of their falsity

or with reckless disregard for the truth.  Miller I, 621 F.2d at 724 (citing Long v.

Arcell, 618 F.2d 1145, 1147 (5th Cir. 1980) (citing Gertz v. Robert Welch, Inc.,

40

418 U.S. 323, 342, 94 S. Ct. 2997, 3008 (1974))).  As the Miller Court explained, where the "only source for the allegedly libelous comments is the informant," "the only way to determine recklessness [is] to examine the reliability of the informant."  Id. at 726; see also id. at 726–27 ("The only way that Miller [could] establish malice and prove his case [was] to show that Transamerican [Press] knew the story was false or that it was reckless to rely on the informant.  In order to do that, he must know the informant's identity."); Star Editorial, Inc. v. U.S. District Court, 7 F.3d 856, 861 (9th Cir. 1993) ("Actual malice would be extremely difficult to prove without knowing whether the confidential sources existed and, if so, what they said and whether they were credible."); Zerilli v. Smith, 656 F.2d 705, 714 (D.C. Cir. 1981) ("When the journalist is a party, and successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure. . . .  Proof of actual malice will frequently depend on knowing the identity of the newspaper's informant, since a Plaintiff will have to demonstrate that the informant was unreliable and that the journal failed to take adequate steps to verify his story.  Protecting the identity of the source would effectively prevent recovery in many [public figure] libel cases."); Marc A. Franklin et al., Mass Media Law 659 (6th ed. 2000) ("The actual malice standard requires the plaintiff to prove that the defendant had serious

41

doubts as to the truth of its publication. To the extent that the disclosure might illuminate the defendant's state of mind, it goes to the heart of the plaintiff's case, and it is evidence that is not likely to be available elsewhere.").

What was true in the Miller case is true here. Price, like Miller, is undisputedly a public figure. Price, like Miller, must prove that the defendants knew that the defamatory allegations they published were false or that they recklessly disregarded the truth. Price, like Miller, must present evidence that the defendants either lied about having a confidential source for the defamatory statements, or that the confidential source or the circumstances surrounding her information were so unreliable that it was reckless to publish a story relying on information she provided. In either case, the identity of the source is necessary, indeed vital, to the proper preparation and presentation of the plaintiff's case.

Price having met the first and third requirements of the Miller test, we turn now to the second one, which is more problematic for him. To meet it, Price must show that he has already used "reasonable efforts to discover the information from alternative sources" and that no other reasonable means for discovering it are available. Miller II, 628 F.2d at 932. Price has taken some depositions, but not enough for us to conclude that he has no other reasonable means of discovering the identity of the confidential source.

42

Yaeger has stated that the confidential source was one of the two women who allegedly had sex with Price in his Pensacola hotel room on April 16, 2003. Yaeger has also testified to his belief that two of three women (the three being Destiny, Jennifer, and Tracy) were the two who had sex with Price. Finally, Yaeger testified that when he belatedly interviewed Nicole, Tracy's roommate, she told him that Tracy had admitted spending the night in Price's hotel room.

Thus, Yaeger has identified four women, some of whom may well have direct knowledge, and almost certainly have indirect knowledge, of the confidential source's identity. Collectively, they are in a position to confirm or deny the truth of allegations in the Sports Illustrated article. Price has not asked any of these women under oath whether she was Yaeger's confidential source, whether she knows who the confidential source is, or whether the allegations attributed to the confidential source are true. Price has represented to this Court that he (or his counsel) has talked with all four of these women and that each of them deny being the confidential source. We have no reason to doubt Price's representations, but the statements of Destiny, Jennifer, Tracy, and Nicole are not in the record. We may consider only evidence that was before the district court when it made its decision. See Harris v. United States, 768 F.2d 1240, 1242 (11th Cir. 1985), vacated on other grounds 479 U.S. 957, 107 S. Ct. 450 (1986).

Moreover, so far as the record before us shows, none of the women was under oath when she spoke to Price or his counsel and none was subject to cross-examination. "The object of requiring an oath is to instill in the witness an awareness of the seriousness of the obligation to tell the truth, or to affect the conscience of the witness and thus compel the witness to speak the truth, and also to lay the witness open to punishment for perjury in case the witness willfully falsifies." 81 Am. Jur. 2d Witnesses § 682 (2004). Before we can say that Price has exhausted all reasonable alternative means to discover the identity of the confidential source, he must depose the four women from whom he is most likely to discover that identity, especially since the source is almost certainly one of three (Destiny, Jennifer, or Tracy). This requirement is consistent with this circuit's qualified First Amendment privilege law as explicated in Miller. See Miller I, 621 F.2d at 723–26.

Price protests that there is no guarantee that the women will tell the truth in their depositions. There is, to be sure, no guarantee that any witness will tell the truth but, in deciding what efforts are reasonably necessary in this context, we indulge the expectation that runs throughout the law that testimony given under oath will be truthful. And we do have a guarantee of sorts that the truth about the confidential source's identity will come out in these four depositions.

44

At oral argument we asked counsel for the defendants about his duty to correct false testimony that he hears a witness give on a material matter. More specifically, we asked him point blank what he would do if he heard the person he knows to be the confidential source deny under oath in deposition that she was the confidential source. It would be fair to say that counsel was somewhat uncomfortable with this question, but he did assure us that he would do his duty as an officer of the court and inform the district court that the witness' sworn denial was false. That assurance is important to our decision that Price should be required to depose the four women, one of whom almost certainly is the confidential source, before the defendants are forced to divulge the source's name. It is important because it assures us the identity of the confidential source (or perhaps the absence of one) is virtually certain to be discovered either from the deposition testimony of the women or through the ethically compelled disclosures of counsel for the defendants, correcting any material testimony that he knows to be false.

For the reasons we have explained, the deposition of the four women should produce the identity of the confidential source, one way or the other. Once the confidential source is known, the defendants will have no basis for refusing to confirm the source's identity. The lawsuit can then proceed. If, however, our

45

expectations are not met and for some reason the deposition of the four women does not result in the confidential source being identified, Price will have exhausted all reasonable efforts to obtain her identity by other means and the district court can re-instate its disclosure order.

The defendants argue that Price ought to be required to depose all seventeen people they listed in answer to his interrogatory asking Yaeger to name everyone he had interviewed in connection with the story. Three of the seventeen are Destiny, Jennifer, and Nicole, whom we are making Price depose. It is clear from the record that most of the remaining fourteen people on that list have limited information (some were interviewed only in connection with the Tuscaloosa incident), and we fail to see why Price should be forced to depose all of them. If Yaeger has told the truth in his deposition, the identity of the confidential source can be discovered by deposing the four women. If Yaeger has not told the truth in his deposition, he has no call on this Court to require more effort from Price in his quest for the truth. The Miller decision requires "reasonable efforts" at alternative means of discovery, not every effort and not efforts for which there is a high probability of futility. In this area it is reasonable to require that a party beat the bushes, but it is not reasonable to require him to pull up every tree, bush, and blade of grass by the roots.

## V.

The district court's May 5, 2004 order, insofar as it compels the defendants to disclose the confidential sources for the Tuscaloosa incident part of the magazine article, is VACATED AS MOOT. The order, insofar as it compels the defendants to disclose the confidential source for the Pensacola incident part of the article, is VACATED and the case is REMANDED for further proceedings consistent with this opinion.