[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 23, 2010
JOHN LEY
CLERK

No. 09-15373
_____

D. C. Docket No. 08-00055-CV-HL-7

SOUTHWEST GEORGIA FINANCIAL CORPORATION,

Plaintiff-Counter-
Defendant-Appellant,

EMPIRE FINANCIAL SERVICES INC.,

Plaintiff-Appellant,

versus

COLONIAL AMERICAN CASUALTY AND SURETY COMPANY,

Defendant-Counter-
Claimant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(September 23, 2010)

Before HULL, MARTIN, and FAY, Circuit Judges.

PER CURIAM:

Southwest Georgia Financial Corporation and Empire Financial Services, Inc. appeal the district court's grant of summary judgment in favor of Colonial American Casualty and Surety Company.

I.

This is an insurance coverage dispute. Plaintiff-Appellant Southwest Georgia Financial Corporation is a bank holding company. Plaintiff-Appellant Empire Financial Services, Inc. is a wholly-owned subsidiary of Southwest Georgia Financial that originates, sells, and services commercial real estate loans.[1] Defendant-Appellee Colonial American Casualty and Surety Company issued a "D&O Selectplus Insurance Policy" to Southwest Georgia Financial. Empire is an insured under the policy. In March 2006 Empire loaned $21,735,000.00 to Zohouri Development Asbury Commons, LLC and $15,900,000.00 to Henderson Mill, LLC. The loan proceeds were to be used by Farbod Zohouri, a real estate developer, to purchase two apartment complexes in Atlanta, Georgia and convert them into condominiums. Empire sold undivided ownership interests in the Asbury Commons and Henderson Mill loans to "participating banks" under an

---

[1]We will refer to the plaintiffs-appellants collectively as Empire except when context requires the companies to be referred to in their individual capacities.

Adjustable Loan Participation Sale and Servicing Agreement ("participation agreement"). The participating banks provided Empire with money that the company used to fund the loans. In exchange, each participating bank was entitled to receive "its pro-rata amount of all monthly payments received by [Empire] on the [Asbury Commons or Henderson Mill loan], less that amount produced by three-eighths of one percent of the then applicable interest rate on the [l]oan."

The participation agreement provided that if Asbury Commons, LLC or Henderson Mill, LLC defaulted on the loans, Empire would foreclose on the apartment complexes securing them. After the properties were sold at a foreclosure sale, Empire would distribute to each of the participating banks its pro rata share of the sales proceeds.

As part of its sales effort, Empire provided the participating banks with credit offering reports. The reports stated that closing would not occur on the Asbury Commons and Henderson Mill loans until pre-sale contracts had been obtained for 30% of the units. Despite that representation, both loans were closed before 30% of the units were pre-sold. Empire's Executive Vice President, Bill

Osborne, omitted the pre-sale requirement from the loan commitment letters signed by Zohouri and the closing instructions provided to Empire's attorney.[2]

From a September 2006 news report on a local television station, Empire learned that the FBI was investigating Zohouri for mortgage fraud. Empire audited the Asbury Commons and Henderson Mill loans and discovered that both loans were closed without the pre-sale contracts. On October 5 Southwest Georgia Financial informed Colonial about the matter but did not make a claim. On October 16 Empire placed both loans in a state of default after Zohouri failed to make his October loan payment. Empire eventually foreclosed on Asbury Commons and Henderson Mill and purchased both properties at a foreclosure sale in July 2007.

A.  Settlement Payments to Asbury Commons Participating Banks

In August 2007 Southwest Georgia Financial reported the Asbury Commons loan as a potential claim to Colonial. In mid-October Colonial informed Southwest Georgia Financial that it could not determine whether there was coverage under the policy because no "claim" had been made by any of the

---

[2]Empire never received any pre-sale contracts for Asbury Commons. It received pre-sale contracts for Henderson Mill after closing the loan, but those contracts were later determined to be unenforceable.

participating banks. The company also reserved all its rights and defenses under the policy.

In early December 2007 each of the Asbury Commons participating banks sent a letter to Empire "demand[ing] the immediate return of its principal." On December 11 Empire sold the Asbury Commons property for $14,750,000.00. The next day, Empire wired each of the participating banks their pro rata share of the sales proceeds as required by the participation agreement. Two days later, Southwest Georgia Financial forwarded the participating banks' demand letters and a spreadsheet to Colonial. The spreadsheet showed each participating bank's (1) percentage ownership interest in the Asbury Commons loan; (2) principal investment; and (3) pro-rata share of the sales proceeds. Southwest Georgia Financial informed Colonial that Empire intended to enter into settlement agreements with the participating banks. Under the settlement agreements, Empire would pay each participating bank the difference between its principal investment and pro rata share of the sales proceeds. Southwest Georgia Financial requested Colonial's consent to the settlement agreements. Before receiving a response from Colonial, Empire paid each of the participating banks the settlement amount. Empire paid a total of $1,368,171.18 to the Asbury Commons participating banks.

In exchange for the payments, each of the participating banks signed a settlement agreement. The participating banks agreed to release "Empire, Empire's subsidiaries, officers, directors, lawyers, affiliates, agents, insurers, contractors, employees (except Bill Osborne), servants, and other representatives from any and all claims . . . arising out of or related to the acts, omissions, transactions, transfers, happenings, violations, promises, contracts, agreements, factors or situations from the beginning of time . . . in connection with the Participation Agreement. . . ."

On December 21, Colonial notified Southwest Georgia Financial that it would not raise lack of consent as a defense to coverage for the Asbury Commons claims. However, it reserved all its other rights and defenses to coverage. In early January 2008 Southwest Georgia Financial sent the Asbury Commons participating banks' settlement agreements to Colonial and requested that Colonial pay the settlement amounts. On January 31, Colonial denied coverage concluding that the settlement payments were not a "loss" within the meaning of the policy. The policy excepts from the definition of loss "any principal, interest or other monies paid, accrued or due as the result of any loan, lease or extension of credit."

Colonial determined that the payments to the participating banks were their unpaid loan balances and denied coverage.

B.  Settlement Payments to Henderson Mills Participating Banks

In June 2008 Bank Independent, one of the Henderson Mill participating banks, filed a complaint against Empire in the Northern District of Alabama.  The complaint alleged that "Empire Financial expressly and admittedly breached its promise to [Bank Independent] that 49 units (or 30%) in the condominium conversion project would be pre-sold prior to loaning money to the borrower."  Bank Independent asserted claims for breach of contract, misrepresentation, suppression, negligence, and breach of fiduciary duty.  The following month, Colonial agreed to defend Empire subject to a reservation of rights.

On August 15, Empire sold the Henderson Mill property for $11,000,000.  Empire paid a total of $847,241.14 in settlement payments to the Henderson Mill participating banks other than Bank Independent.  Also, with the exception of Bank Independent, the participating banks released all claims they had against Empire.  In October, Empire informed Colonial about its settlement agreements with the Henderson Mill participating banks.

In December, Empire entered into a settlement agreement with Bank Independent. Under that agreement, Empire promised to pay the bank $207,000.00. In March 2009, Colonial agreed to pay $71,935.41 of the settlement amount.[3] Colonial denied coverage for the rest of the Henderson Mill participating bank settlements.

## II.

In April 2008 Southwest Georgia Financial and Empire filed suit against Colonial in the Middle District of Georgia seeking damages for breach of contract and bad faith denial of coverage. In April 2009 the parties filed cross motions for summary judgment. On September 21, 2009, the district court granted Colonial's summary judgment motion and denied Southwest Georgia Financial and Empire's. The district court concluded that Empire's payments to the participating banks were not a covered "loss" because the participating banks' losses resulted from Zohouri's lack of liquidity and default on the loans—not the failure to comply with the pre-sale requirements.

## III.

---

[3]Colonial agreed to pay the settlement amount, less the bank's remaining loan principal of $154,330.11, and all attorney's fees over Empire's deductible.

We review *de novo* a district court's grant of summary judgment and, "[i]n so doing, we must view all evidence and draw all reasonable inferences in favor of the non-moving party." Harrison v. Benchmark Elecs. Huntsville, Inc., 593 F.3d 1206, 1211 (11th Cir. 2010). A district court should grant summary judgment if "the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "We can affirm [summary] judgment on any legal ground, regardless of the grounds addressed and relied upon by the district court." Cuddeback v. Fla. Bd. Of Educ., 381 F.3d 1230, 1235 (11th Cir. 2004).

IV.

To resolve this dispute, we must interpret the terms of the D & O Selectplus Insurance Policy. The policy's three insuring clauses provide coverage for "loss" resulting from "claims" made during the policy period for covered "wrongful act[s]." The terms "loss," "claim," and "wrongful act" are defined in the policy. Section 3(L) defines "loss" as "any amount which any Insured is legally obligated to pay as a result of a claim, including damages, judgments, settlements and

9

defense expenses. . . ." Thus, loss means (1) any amount which any insured is legally obligated to pay; (2) as a result of a claim.

The interpretation of the D & O policy presents a question of Georgia law. Under Georgia law, "[a]n insurance policy is governed by the ordinary rules of contract construction." Banks v. Bhd. Mut. Ins. Co., 686 S.E.2d 872, 874 (Ga. Ct. App. 2009). Moreover, "[t]he words used in policies of insurance, as in all other contracts, bear their usual and common significance, and policies of insurance are, as in all other contracts, to be construed in their ordinary meaning." Lawyers Title Ins. Corp. v. Griffin, 691 S.E.2d 633, 636 (Ga. Ct. App. 2010) (quotation marks omitted).

Even if we assume that Empire made a "claim" for a "wrongful act," Empire has failed to establish a "loss" and is not entitled to coverage under the policy. As we have already discussed, the policy excepts from the definition of "loss" (7) any principal, interest or other monies paid, accrued or due as the result of any loan, lease or extension of credit. . . ." Empire contends that the loss exception does not apply because it did not make loans or extend credit to the participating banks. Moreover, it argues that the settlement payments were not "principal, interest or other monies paid . . . as the result of" the Asbury Commons and Henderson Mill

10

loans because the settlement payments were not made until after the properties were foreclosed upon and those loans were extinguished.

Contrary to Empire's argument, its payments to the participating banks fall within the loss exception. The participating banks purchased an undivided ownership interest in the Asbury Commons or Henderson Mill loans. The participating banks' funds supplied the principal on the loans. For its ownership interest, each participating bank was entitled to receive its pro rata share of the monthly loan payments, less three-eighths of one percent of the then-applicable interest rate on the loans. In settlement, Empire paid each of the participating banks the difference between its investment and its pro rata share of the proceeds from selling the Asbury Commons and Henderson Mill properties. Those funds represented money to which the participating banks were entitled "as the result of" the Asbury Commons or Henderson Mill loans. Had no default occurred, the participating banks would have received those funds from their share of the monthly loan payments. Based upon this, we conclude that the payments for which Empire is seeking indemnification are "principal, interest, or other monies paid, accrued or due as the result of any loan" and thus excepted from the definition of loss.

We reject Empire's assertion that the exception does not apply because Empire did not provide a loan to the participating banks. The exception removes from the definition of loss "any principal, interest or other monies paid, accrued or due as the result of *any* loan, lease or extension of credit." See Price v. Time, Inc., 416 F.3d 1327, 1336 (11th Cir. 2005) ("The United States Supreme Court and this Court have recognized on many occasions that the word 'any' is a powerful and broad word, and that it does not mean 'some' or 'all but a few,' but instead means 'all.' "). To accept Empire's construction, we would have to re-write the policy to include the phrase "by the Company" at the end of the exception. That we cannot do. See Ga. Farm Bureau Mut. Ins. Co. v. Coleman, 174 S.E.2d 351, 352 (Ga. Ct. App. 1970) (noting that a court cannot re-write an insurance policy and make a new contract for the parties). Our conclusion that the exception is not limited to loans or extensions of credit made by the insured is reinforced by the definition of lenders' liability claim, which is defined as "a demand or proceeding . . . for a wrongful act concerning an extension *by the Company* of credit, an actual or alleged failure or refusal *by the Company* to extend credit; or an actual or alleged agreement *by the Company* to extend credit." (emphasis added). If the loss exception were intended to be similarly narrow, it would say so. We also reject

Empire's assertion that the exclusion does not apply because the payments were made after the Asbury Commons and Henderson Mill loans were extinguished. The exception provides simply "as a result of any loan."

Because the D & O policy's insuring clauses only provide coverage for "loss" and we conclude that none occurred, we affirm the district court's grant of summary judgment in favor of Colonial.

AFFIRMED.